## DICK CAHILL v. STATE.

No. A-10420. March 12, 1947.

(178 P. 2d 657.)

2

 

Johnson & Jones, of Bristow, for plaintiff in error.

Randell S. Cobb, Atty. Gen., E. J. Broaddus, Asst. Atty. Gen., and Everett S. Collins, Co. Atty., of Sapulpa, for defendant in error.

BAREFOOT, P. J. Defendant, Dick Cahill, was charged jointly with Dr. J. W. Stockton in the superior court of Creek county, Bristow division, with the crime of procuring an abortion upon one Lillian Rheuark; was granted a severance, tried, convicted and sentenced to serve a term of two years in the State Penitentiary, and has appealed.

For a reversal of this case, it is first contended:

"The testimony of the prosecutrix, Lillian Rheuark, was that of an uncorroborated principal (accomplice) upon which a conviction cannot be sustained under the law as prescribed in O. S. A. 1941, 22:742."

The section of the statute referred to is as follows:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

The statute under which defendant was charged is Tit. 21 O. S. 1941 § 861, and is as follows:

"Every person who administers to any pregnant woman, or who prescribes for any such woman, or advises or

procures any such woman to take any medicine, drug or substance, or uses or employs any instrument, or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the penitentiary not exceeding three years, or in a county jail not exceeding one year."

And section 862 of the same Title provides:

"Every woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, unless the same is necessary to preserve her life, is punishable by imprisonment in the county jail not exceeding one year, or by fine not exceeding one thousand dollars, or by both."

It is contended that by reason of section 862, above quoted, one who solicits and permits an operation to be performed is an accomplice of the one who performs the act, or who aids and abets therein, and that the one charged may not be convicted upon her uncorroborated testimony. It is admitted in the brief of the state that if this is true, the evidence in this case is insufficient to sustain the conviction against this defendant.

Counsel for defendant in their brief state that this question has been decided by this court contrary to their contention in the case of Wilson v. State, 36 Okla. Cr. 148, 252 P. 1106, 1107, but that the decision in that case is erroneous and not in accord with the later decisions of this court. That case was decided on February 2, 1927, and the exact question has not been before this court since that time. In that case the court, speaking through Judge Edwards, said:

"Defendant requested that the court instruct that Thelma May Carter; the woman upon whom the abortion

was performed, was an accomplice, which request was denied by the court. This court has not passed directly upon that question."

And after quoting the sections of the statute hereinbefore referred to, said further:

"Under this latter section a female in an abortion case may be prosecuted. This latter section does not define the same offense as in section 1859 [Tit. 21 O. S. 1941 § 861]. The offense defined is the submitting to or soliciting an abortion upon herself and provides for a different punishment. It is generally held that the woman upon whom an abortion is performed is not an accomplice, but rather is a victim. In 1 R. C. L. pp. 87, 88, § 25, upon the subject 'Abortion,' it is said:

" 'In the absence of any statutory provision to the contrary the accused may be convicted on the uncorroborated testimony of the woman. And even though the testimony that the woman gave before the magistrate on the preliminary examination of the accused was false, a conviction on her uncorroborated testimony may be upheld. Though conviction on the uncorroborated testimony of an accomplice is prohibited, still where under the statute against procuring a miscarriage, the woman on whom it is procured is not liable to indictment, she does not, by consenting to the unlawful operation, become an accomplice in the crime, and this is true even though the woman performs the operation upon herself at the instigation of the accused. The reason for this is that to render one an accomplice he must be punishable for the offense involved, and she is regarded as the victim of the crime, rather than a participant in it. Though as a first impression it may seem to be an unsound rule that one who solicits the commission of an offense, and willingly submits to its commission upon her own person, should not be deemed an accomplice, while those whom she has thus solicited should be deemed principal criminals in the transaction, still in cases of this kind the public welfare demands the strict

application of the general rule as to who are accomplices. * * *'

"1. C. J. p. 331, § 111 (2), states the rule thus:

" 'While a woman on whom an abortion has been performed is not an accomplice so as to require corroboration of her testimony, within the rule requiring evidence in corroboration of an accomplice's testimony in order to convict, some statutes provide that a conviction shall not be had on the uncorroborated testimony of the woman. * * *'

"Numerous authorities are cited in support of the text. See, also, Hammett v. State, 84 Tex. Cr. 635, 209 S. W. 661, 4 A. L. R. 347.

"The second assignment challenges the instructions of the court No. 11 for the reason that it does not include the witness Thelma May Carter as an accomplice. This contention has been disposed of by what has just been said."

The Oklahoma cases decided by this court since the Wilson case and cited by defendant are bribery cases, known as the "Oklahoma School Board" cases, and are Spivey v. State, 69 Okla. Cr. 397, 104 P. 2d 263; and Capshaw v. State, 69 Okla. Cr. 440, 104 P. 2d 282, 289.

We have carefully examined the above cases, and are of the opinion that the law announced therein does not overrule, nor is it in conflict with, the case of Wilson v. State, supra. The decisions in those cases are based principally upon the evidence produced showing that a conspiracy existed between the parties to receive bribes for the doing of the unlawful acts. The evidence sustained this proposition, and it was pointed out in those decisions that there existed ample testimony outside of the principals to corroborate the testimony of those convicted. Here there was no testimony of a conspiracy between the defendant and his codefendant, J. W. Stockton.

We do not think the principles announced in the Wilson case should be overruled by this court. We have examined many cases which sustain the view as expressed in that opinion, and they are cases dealing directly with abortion cases.

In a note appearing in 139 A. L. R. p. 993, this identical question is discussed and all of the cases in which the question has been considered are cited. A number of the cases are identical as to the facts with the Wilson case, and the statutes construed almost identical with the Oklahoma statutes. State v. Tennyson (Minn.) 2 N. W. 2d 833, 139 A. L. R. 987; Dunn v. People, 29 N. Y. 523, 86 Am. Dec. 319; Commonwealth v. Boynton, 116 Mass. 343; State v. Carey, 76 Conn. 342, 56 A. 632; Gray v. State, 77 Tex. Crim. R. 221, 178 S. W. 337; Grissman v. State, 93 Tex. Cr. R. 15, 245 S. W. 438; Bristow v. State, 137 Tex. Cr. R. 220, 128 S. W. 2d 818; State v. McCurtain, 52 Utah, 63, 172 P. 481; State v. Smith, 99 Iowa 26, 68 N. W. 428, 429, 61 Am. St. Rep. 219; Smartt v. State, 112 Tenn. 539, 80 S. W. 586.

In the note cited above, at page 994, the author states:

"Majority view. a. In general.

"In a large majority of the cases the view is taken that the woman upon whom an abortion is committed or attempted is not an accomplice to the crime."

In Oklahoma we have a number of statutes which should be considered in connection with this case: Tit. 21 O. S. 1941 §§ 861 and 862, hereinabove quoted, and Tit. 21 O. S. 1941 §§ 171, 172 and 173, which are as follows:

"§ 171. * * * The parties to crimes are classified as:

"1. Principals, and,

"2. Accessories. * * *

"§ 172. * * * All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals. * * *

"§ 173. * * * All persons who, after the commission of any felony, conceal or aid the offender, with knowledge that he has committed a felony and with intent that he may avoid or escape from arrest, trial, conviction, or punishment, are accessories."

And Tit. 22 O. S. 1941 § 742:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

In the case of State v. Tennyson, supra, the court had under consideration the construction of statutes almost identical with Tit. 21, O. S. 1941 §§ 861 and 862, hereinbefore quoted. The court drew a distinction between the two statutes, one of which charged a person with abortion under a statute similar to section 861 of our statute, and the other similar to section 862, which makes it a crime for a woman to perform or permit an abortion to be performed upon herself. That case holds that these statutes constitute separate and distinct crimes, and that the principals guilty of one crime are not accomplices of those who are guilty of a separate and distinct crime within the rule that the testimony of one cannot be corroborated by that of another. Other cases heretofore cited which are identical in announcing this rule are People v. Vedder, 98 N. Y. 630, State ex rel. Thurston v. Sargent, 71 Minn. 28, 73 N. W. 626.

For the reasons above stated, we are of the opinion that the decision in the Wilson case is sound, and is supported by the great weight of authority, and should not be overruled.

However, this court has often held that while it is not absolutely necessary in rape cases that the prosecutrix should be corroborated in order to sustain a conviction, we have also often announced in these same cases an exception to this rule, that where the evidence of the prosecutrix is improbable, contradictory, and not of that character which justifies its belief, or where she has been impeached, it will be required that her testimony be corroborated. Reeves v. Territory, 2 Okla. Cr. 351, 101 P. 1039; Morris v. State, 9 Okla. Cr. 241, 131 P. 731; McLaurin v. State, 34 Okla. Cr. 324, 246 P. 669; Williams v. State; 61 Okla. Cr. 396, 68 P. 2d 530; Coppage v. State, 76 Okla. Cr. 428, 137 P. 2d 797; Lancaster v. State, 79 Okla. Cr. 395, 155 P. 2d 548; Gullatt v. State, 80 Okla. Cr. 208, 158 P. 2d 353.

With reference to abortion cases, we see no reason why the same rule should not be applied. Every reason for their application is as strong in abortion cases as in rape cases. Certainly in the instant case there is strong reason for its application.

The Attorney General in his brief says:

"We concede that if the court determines Mrs. Rheuark was an accomplice of defendant, and that it was necessary that her testimony be corroborated, the evidence is insufficient to sustain the conviction."

What, then, are the facts in this case? Defendant was charged jointly in the district court of Creek county with Dr. J. W. Stockton, both of Bristow, Okla., with committing an abortion on one Lillian Rheuark on April 20, 1942.

Defendant owned and operated a drugstore in that city, and Dr. Stockton was a chiropractic doctor with offices above the drugstore. The prosecutrix, Lillian Rheuark, was a woman 23 years of age. She had been twice previously married, and was the mother of a child seven years of age. According to the evidence she had previously had an abortion performed by the codefendant, Dr. Stockton, and was acquainted with him when she entered the place of business of defendant on April 17, 1942. She had driven to Bristow from her home in Sapulpa, and was accompanied by her seven-year old son.

The testimony of the prosecutrix was that on the morning of April 17, 1942, she went into the drugstore of the defendant, "and told Cahill that I was pregnant and I wanted to get rid of it, and I told him that I didn't have any money, that I wanted him to hold my watch until I got the money, and if he would see whether he could get it done like that." That defendant told her to wait a minute and he would see and he went out in front of the drugstore and called Dr. J. W. Stockton and they talked about five minutes, and defendant returned and told her it would be all right. That she went to the office of Dr. Stockton where "he opened me up as a doctor would a pregnant woman," using doctor's instruments that looked like scissors which he inserted in her womb, and that he told her: "If it don't happen in a week's time come back and we will open it up again." That on the next Monday, April 20, 1942, she returned to Bristow and went straight to the doctor's office, where he did as before, and he placed a little piece of wood in her womb. She started to return home and just before leaving Bristow and about a block from the doctor's office, she had a car wreck and was taken to the hospital in Bristow, where she had a miscarriage, and was operated on twice at the hospital, and the fetus and a block of

wood were discharged or removed. She testified that she did not have any financial transactions with Dr. Stockton, but that all her arrangements were with defendant Cahill. That she gave her watch to defendant and told him what she wanted, but never told Dr. Stockton because he knew. On cross-examination she testified that her mother's name was Perry, and her father was dead. She was married in Florida to a man named Reddick, who was the father of her seven-year old boy. She was divorced four years previous to the trial, and had not remarried until November 15th, and the year of her marriage was not shown. That she had never gone by any name other than that of her mother and her husband, and that of Lillian Bradley and Lillian Rheuark. She testified that on her way to Bristow at the time of her last visit on April 20th, she stopped at a little honky tonk and had them bring her two bottles of beer, which she drank. She talked with the officers after the auto accident and told them her condition and desire to get home. She had never been arrested in connection with the traffic accident, although she did not have a driver's license, and left the scene of the accident. She admitted that she knew Dr. Stockton prior to coming to the drugstore "from another time for the same thing."

A doctor and nurse testified for the state as to the prosecutrix entering the hospital at Bristow and of her miscarriage, and the passing of a foreign substance like bark. Also, to the records of the hospital which were made by another who was not present at the time. This was all of the evidence of the state.

It may be noted that if the codefendant, Stockton, had been on trial and convicted, that the evidence was such that it might be held to corroborate the prosecutrix as to

him. The defendant did not take the witness stand, but he produced four witnesses in his behalf.

R. W. Williams testified that he was, at the time of the trial, living at Norman, Okla., and was working as a labor superintendent at the Naval Hospital Base there. That he had known the defendant for about 15 years. That he was by occupation an oil field operator and lived at Bristow on April 17, 1942. That he made headquarters at defendant's drugstore, and that on the above date he was engaged in drafting a map showing the drainage area of some land. That he had been across the street at the hotel where he lived, and when he returned to the drugstore he saw a woman, later identified as the prosecutrix, in the store. That she was drinking a "coke" and then went back to the third booth on the north side of the building, and that witness heard a conversation between her and the defendant. The substance of this conversation is stated in defendant's brief, and we have carefully examined the record, and find it to be correct. The statement of the testimony as set out in defendant's brief is as follows:

"She asked Mr. Cahill if he remembered her and said she had been there a year or a year and a half before. She asked him where Dr. Stockton was and asked him to call him. Mr. Cahill started to the telephone to call Dr. Stockton and the witness had just come across from the hotel and had seen the doctor in an adjacent building to the drugstore watching a baseball board in a pool hall where the boys would come in and wage their money on the major league games. On hearing Mrs. Rheuark ask for Dr. Stockton, the witness himself informed them that the doctor was in the pool hall next door and didn't say anything further, but Mr. Cahill went to the door and called for the doctor and the doctor and Mrs. Rheuark went back to the third booth where she had been, about twelve feet from where the witness was sitting. They talked about two minutes. Dick Cahill had no conversation at all with this woman, other

12

than to comply with her request to find Dr. Stockton, until after Dr. Stockton left, then she 'wanted to soak a watch to Dick.' Dick ran a kind of pawnbroker and money loaning business where witness had seen the boys soak boots and watches, and Mrs. Rheuark wanted to soak the watch to Dick, and Dick wanted to hold her down to $20 on it, and the witness listened to see what kind of a deal they made. 'She wanted $30 and Dick told her the watch wasn't worth $30, and he kept trying to get her to take $20, and he drew a check for $35, though the witness didn't see the check. 'He drew the check for himself and she signed the check, or wrote on it,' and Cahill 'gave her two bills, a twenty and a ten.' The witness saw the money. When she got the money she went out of the drugstore. Cahill took the watch and the piece of paper and went up to the front of the drugstore and put them in a safe. She insisted that he hold the watch and she said she wouldn't take a $100 for it and that somebody, either a chauffeur or a truck driver, would be by and pick it up later. At that time the woman appeared to be a little flighty and witness did not know what was said between her and Dr. Stockton, but Dick Cahill on that occasion had no conversation with Dr. Stockton so far as the witness knows. The woman had already talked to Cahill before he went after Dr. Stockton, in that she asked where he was. When Cahill started after Dr. Stockton, the witness told him where Dr. Stockton was and Cahill went to the door and called Dr. Stockton from the front door of the pool room, that is, he stood at his door and hollered in to the adjacent pool room for the doctor and he and the doctor came back together, but did not talk together. Cahill simply told Stockton that there was a lady wanting to see him and that she was back there."

Dr. J. W. Stockton testified in behalf of defendant. He corroborated the witness Williams as to being called by defendant and of talking to the prosecutrix, of his going to his office, and her soon appearing there. He had no conversation with defendant with reference to performing an

abortion on prosecutrix, and the only conversation was that defendant called him and told him a lady was in the drugstore waiting to see him. He testified that she told him she had a bloody discharge, and upon examination he found that she did have, and he gave her the regular treatment for that. That he did not perform an abortion on her. That she stated to him : "I haven't got any money now, but my sweetie is a truck driver and he will be in in two or three weeks." He denied using any kind of instrument on her, except, "I took an instrument and put some cotton on it and swabbed the mouth of the uterus and cleaned it out, the way I do in treating cases like that," and denied placing a piece of wood in her womb.

He further testified to her returning to his office the following Monday, and his examination of her, and discovering that she was going to miscarry, and that he asked her what she had been doing, and she replied : "I have done everything. I have done enough to kill anything." He told her she had "killed it, and had done a good job of it"; and she said, "I always have to go to a doctor to be cleaned out." He testified that he told her : "You just as well not let that bother you because you are going to have to go and the sooner you go the better off you are." She did not pay him any money. He had no conversation with defendant with reference to treatment of prosecutrix. Defendant at no time intimated or said to the witness that he would pay or stand good for the bill of prosecutrix. The only conversation he had with defendant was that defendant informed him a woman was waiting in the drugstore to see him. This witness further testified that in case of an emergency a chiropractor, under his license, could do anything he felt necessary for the benefit of his patient, the same as a medical doctor, including the use of a knife.

Dr. E. W. King, testifying for defendant, stated that on the night of April 20, 1942, he examined Lillian Rheuark at the Bristow General Hospital but that he found nothing to indicate to the satisfaction of the mind of the witness that anyone had recently used any surgical instrument, or metallic instrument of any kind on the woman. He found no bruises from any instrument, no cutting or puncturing, or anything of that kind. That the examination was made by the witness, Dr. Schrader and Dr. Reynolds.

On further cross-examination prosecutrix testified to the entering of the drugstore and of the conversation with defendant. She admitted the presence of someone who was working on some maps, but said he left the drugstore before the conversation with defendant, and that no one else entered the drugstore or was present during the conversation. She testified to leaving the watch with defendant to hold until she paid him $35. She was asked with reference to signing the check, and she replied:

"A. He wrote the check for $35 and then tore it up. He wouldn't let me have it."

At this time she was presented with the check, and admitted it was her signature on the check. She then testified:

"A. He tore one up I am sure. I would swear my heart out on it."

The check was introduced in evidence and was as follows:

"Community State Bank 86—1212
"Bristow, Okla. May 1, 1942 No.—.
"Pay to _____ Cash _____ $35.00 Thirty-five _____Dollars.
"/s/ Lillian Bradley
"910 N. Bryant, Sapulpa, Okla."

She testified she thought it was about a week before she returned to Bristow and went right to Dr. Stockton's office. She had two drinks before she got there. The doctor did the same thing to her as he did before. She was all right at that time. When she left the doctor's office at this time and started home she had the wreck and was taken to the hospital.

It will be noted that there is direct conflict in the testimony of the prosecutrix and the witness R. W. Williams and the codefendant Dr. J. W. Stockton as to the participation of this defendant in this crime, if one was committed. As suggested by Attorney General, there is absolutely no corroboration of the prosecutrix as to the guilt of the defendant. So far as the record is concerned the witness Williams is a disinterested witness. His statement stands uncontradicted except by the testimony of the prosecutrix, and he is corroborated in every detail by the codefendant Stockton. There are two outstanding parts of the testimony of the prosecutrix. One that she first testified that the check signed by her for the $35 was torn up by defendant, and then when confronted with the check and shown her signature, she admitting signing it, but attempted to excuse her former testimony by saying that one check was torn up. The check signed by the prosecutrix was strong corroboration of the evidence given by the witness Williams. The contention of defendant as to the county attorney failing to file charges against the prosecutrix in reference to the traffic accident does not appeal to us. This was a matter to be handled in the discretion of the county attorney and there is nothing in the record to indicate that he did anything but his duty as he saw it.

We are well aware of the rule that has been often announced by this court that where there is a conflict in the

evidence and the evidence of the state is sufficient to sustain the judgment and sentence, the case will not be reversed. This rule should of course be considered in connection with the well-established rule heretofore mentioned where in rape or abortion cases it is not absolutely necessary that the prosecutrix be corroborated, but this court as an exception to that general rule will carefully examine the evidence to ascertain if the testimony of the prosecutrix is improbable, contradictory, or not of the charactor which justifies its belief, or that witness has been impeached.

With reference to the testimony of the prosecutrix in this case, it occurs to us from what has heretofore been stated, that her testimony as it pertains to the guilt of this defendant is contradictory and doubtful, in view of the whole evidence as shown by the record in this case.

There is one other proposition revealed by the record, and that is that the defendant, as hereinabove stated, was charged jointly with Dr. J. W. Stockton. A motion for severance was made and granted, as the law requires in felony cases. Under the law the state then had the right to choose which of the defendants would be tried first. In this instance, the codefendant, Dr. J. W. Stockton, was the principal defendant, as he was the one who allegedly had actually performed the abortion. It would have been but natural to expect that the state would elect to try him first, but instead, the defendant was first tried. It may be that the state had ample reason for its action in first trying defendant, but, while the record here does not disclose the fact, we have been informed by the Attorney General that the case against the codefendant, Dr. J. W. Stockton, has never been called for trial to the present time, but upon numerous occasions has been continued by the state. Defendant was tried many months ago. Several terms of

court have passed since that date and the codefendant has not been tried. The trial of one case will not be considered in connection with the trial of a codefendant, nor depend upon the result therein, but it does occur to this court that it would not be exact justice under the evidence in this case to permit this defendant to suffer the penalty of a prison sentence and his codefendant never be tried.

Other questions have been presented by the brief filed in this case, but from what has been heretofore stated, we consider it unnecessary to refer to them.

For the reasons above stated, we are of the opinion that the judgment and sentence of the superior court of Creek county, Bristow division, should be reversed, and the case remanded. It is so ordered.

JONES and BRETT, JJ., concur.