CECIL B. HEATH *v.* STATE OF ARKANSAS

5506                                    459 S. W. 2d 420

Opinion delivered October 19, 1970

*Doris McKnight,* for appellant.

*Joe Purcell,* Attorney General; *Mac Glover,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. This is an abortion case. Cecil B. Heath, appellant herein, was charged with the offense of attempting to produce an abortion by the use of a crochet needle and a catheter, and on a second trial was convicted,[1] fined $500.00, and sentenced to imprisonment for a period of five years. From the

---

[1]The first trial resulted in a mistrial.

judgment so entered, appellant brings this appeal. For reversal three main points are asserted, it first being alleged that the court erred in overruling appellant's motion to quash the evidence. It is contended under point two that the court should have directed a verdict for appellant at the close of the state's case, this contention being based on three sub-points, which will be subsequently discussed. Finally, it is asserted that the court erred in allowing the prosecuting attorney to cross-examine the appellant's witness, Betty Ann Heath, wife of appellant, concerning certain items allegedly located in the Heath premises.

The first point relates to the state's action in obtaining a search warrant for the purpose of searching appellant's home for certain items which are sometimes used in performing an abortion, this warrant being issued by the Municipal Court of Forrest City. Appellant attacks the affidavit, the warrant itself, and the authority, under Arkansas law, to issue a search warrant in this type of case. We see no need to discuss the arguments presented for the reason that none of the items seized by the officers under the authority of the search warrant were offered in evidence by the state. The only exhibits offered were the hospital records pertaining to the treatment of Mrs. Clara Snider, upon whom the attempted abortion was committed, and the apparatus which was used to induce the attempted abortion. It is not contended that these exhibits were obtained by an unlawful search or seizure. Accordingly, since the items obtained through the alleged unlawful search and seizure were not offered into evidence, no prejudice could have resulted, and the point is without merit. See *Evans* v. *U. S.,* 325 F. 2d 596, and *People* v. *Marsh,* 26 Cal. Rptr. 300, 376 P. 2d 300.

It is next asserted that the court erred in failing to direct a verdict at the conclusion of the state's case for the defendant for three reasons. The first argument is directed to appellant's contention that the state's prosecuting witness, Mrs. Clara Snider, being the party upon whom the abortion was attempted, and consenting that

the act be done, was an accomplice, and that her testimony was not sufficiently corroborated. Appellant requested the jury be instructed that Mrs. Snider was an accomplice and that her evidence must be corroborated before appellant could be convicted. The court did not err in refusing to give this instruction, for under Arkansas law, Mrs. Snider was not an accomplice, and her testimony was sufficient, if believed by the jury, to support the conviction. This is clearly the general rule, and the few cases holding otherwise seem to be based on particular statutes. Our own statute, Section 41-303 Ark. Stats. Ann. (Supp. 1969) is directed toward the person who administers or prescribes medicine or drugs to any woman with child, with intent to produce an abortion, or to produce or attempt to produce an abortion by any other means.[2] There is no mention of any penalty for the pregnant woman, and we have no case holding the person upon whom the abortion is performed to be a principal or an accessory, or in any other way, a *particeps criminis*. Arkansas has several abortion cases in which the person attempting the abortion was convicted largely on the testimony of the woman upon whom the act was performed or attempted, but the question of whether the prosecuting witness was an accomplice has never been raised, it evidently being accepted that she could not be considered in that category. See *Burris* v. *State,* 73 Ark. 453, 184 S. W. 723, *Thompson* v. *State,* 260 S. W. 723 (not reported in Arkansas).[3] We find no merit in appellant's argument and thus there is no need to discuss the matter of corroboration but, if it were otherwise, we might say in passing that we consider Mrs. Snider's evidence to have been sufficiently corroborated to have presented a jury question as to appellant's guilt or innocence.

It is next asserted that the evidence reflects that

[2]Section 41-303 Ark. Stats. Ann. (1969 Supp.), a part of Act 61 of 1969, is an exact copy of Section 41-301 Ark. Stats. Ann. (1964 Repl.) insofar as it deals with illegal abortions, not being changed nor affected by Act 61. This later statute deals primarily with the requirements for a legal abortion.

[3]In this case the defendant was convicted upon the sole testimony of the woman upon whom the abortion was performed.

witness testified that she was interviewed by Sergeant Mitchell of the Arkansas State Police the day after entering the hospital and she admitted that she had told the officer that the attempted abortion occurred in Jonesboro. The record then reveals the following:

"Q. And let me ask you if either Sergeant Mitchell or some police officer did not advise you that you could be prosecuted as an accessory to the crime of abortion?

A. I don't know as it was said in those words.

Q. Well, was it intimated to you in any words?

A. It was explained to me that this type of thing should not have happened, and the person who did it should be prosecuted for it.

Q. But, you are not answering my questions. I asked, did this police officer advise you or tell you you could be prosecuted as a party to an abortion?

A. Yes.

Q. Now, that is what I asked you, and the answer to that is yes?

A. Yes.

Q. And it was after this that you told them that Jerry Heath did this, is that correct?

A. Yes, I did.

Q. And it was also asked by this same investigator, 'Did not Mr. Heath do this? Didn't Jerry Heath do this?' They asked you that several times, didn't they?

A Yes.

Q. And you told them no, isn't that correct?

A. Yes, I told them no because I didn't want anyone to know who had done it.

Q. But, after it was explained to you that you could be prosecuted for it, you said that it was Mr. Heath, is that correct?

A. They said it would go hard on me if I didn't tell who did it."

In reading this evidence, it will be noted that the answers most relied upon by appellant are those wherein counsel, in vigorous cross-examination, stated the answer desired in the question, and the witness only replied "yes". It is true that counsel was entitled to ask these questions on cross-examination, and there was certainly nothing out of line in doing so. Still, it would appear, that under the circumstances of this case, "yes" and "no" answers are not nearly so persuasive as those answers in which the witness makes the statement herself or voluntarily elaborates. The answer "it was explained to me that this type of thing should not have happened and the person who did it should be prosecuted for it" is in the words of the witness herself. The answers, of course, are somewhat contradictory, but at any rate, the testimony mentioned does not, as a matter of law, so taint the testimony that it was inadmissible. A similar case, though one in which the facts were much more favorable to appellant, was *Scott v. State*, 169 Ark. 326, 275 S. W. 667, where Scott was convicted of carnal abuse of a girl about fourteen years of age. The principal point for reversal was that the testimony of the girl was extorted from her by duress exercised by the trial judge and the prosecuting attorney, and that the court erred in permitting the witness under those circumstances to testify against appellant. The opinion, by Chief Justice McCulloch, sets out that the prosecuting witness was called by the state, and after a few preliminary questions, was told by the prosecuting attorney of the charge against appellant and di-

rected to tell the jury just what happened. The witness made no answer, and was then told by the trial judge to tell what occurred. Still no answer was made, and after further unsuccessful urging, the girl was temporarily excused and another witness was called. The prosecuting witness was recalled but still made no answer to the questions propunded to her. Finally, the court said:

"Young lady, I am getting out of patience with you. I think it is as much stubbornness as anything else. Take your hands down from your face and answer the question."

Her father was then directed to take her to the jury room to see if he could "do anything with her". The opinion then recites:

"After a short absence all of the persons named returned to the court room, and the attorney for appellant made objections to the introduction of the witness on the ground that duress was being used to force the witness to testify. This occurred during the afternoon, and the court announced that there would be an adjournment over until next morning, and stated to the witness that she would be expected to answer questions the next morning and tell the truth. On the next day the girl was recalled to the witness stand, and when the first question was propounded to her she announced that she was not going to prosecute appellant and gave the same answer to repeated questions. There was one question, however, which she answered in the negative, and that was the one propounded by the prosecuting attorney as to whether or not she had ever had sexual intercourse with appellant. She answered, 'No, sir'. The prosecuting attorney then asked her if her testimony before the grand jury was false, and she made no answer to that question. The court then directed the sheriff to take the witness to jail, and the jury was allowed to separate with the usual admonition not to have any conversation about the case. In the afternoon the girl was again called to the witness stand and answered the questions of the

prosecuting attorney, narrating the circumstances under which the alleged crime was committed. She was cross-examined at length by appellant's counsel, and other witnesses were introduced tending to show contradictory statements made by the girl to other persons.

Appellant insists that the record shows that coercion was used to compel the girl, not merely to testify in the case, but to testify to particular facts against the appellant, and counsel contend that this rendered the testimony of the witness incompetent. We do not agree with counsel that they are correct in their contention as to what the record shows. *It is true that one answer given by the witness exonerated appellant from guilt, and that was the only question which was answered by the witness until she finally concluded to testify in full.* [Our emphasis] It is manifest, however, from a consideration of the whole record that both the trial judge and the prosecuting attorney were merely endeavoring to induce the witness to testify—not to compel her to testify to any given state of facts. She was repeatedly admonished that all she was expected to do was to tell the truth and to narrate what had happened, if anything, between her and appellant on the occasion mentioned in the indictment. Certainly it was the duty of the court to compel a recalcitrant witness to testify."

It is evident that the facts there relied upon, particularly the italicized portion, were much stronger than those in the case before us.

It might also be mentioned that the cases involving the testimony of an accomplice against one with whom he committed the crime, are in a sense analogous. In the case of *Vaughan* v. *State* 57 Ark. 1, 20 S. W. 588, the proof reflected that Hamilton killed W. A. Gage. Hamilton testified that he killed Gage and that Vaughan promised him a certain sum of money if he would do so, and appellant had procured for him the gun with which the killing was done. It developed that Hamilton's attorneys had made an agreement with the prosecuting attorney that Hamilton would testify, provided he

would be permitted to plead guilty to murder in the second degree. In an opinion by Chief Justice Cockrill, this court said:

"Hamilton was a competent witness. The proof relied upon to exclude his testimony tends only to show that he was induced to testify by an offer of leniency of punishment. The fact could affect his credibility only."

Here, too, the acts complained of could only affect the credibility of the witness. The jury heard this evidence and it was within their province to determine whether Mrs. Snider was truthful in testifying that Mr. Heath was the person who attempted the abortion.

The third sub-division under point two is that the evidence established that the appellant was not guilty of the crime with which he was charged, and the court should have directed a verdict in his behalf. Mrs. Snider testified that she met Heath in Memphis at Jetts Beauty Salon where he worked, and that he set her hair each week. She said that he had told her about performing an abortion on another girl and she (Mrs. Snider), being pregnant, asked if he would help her. He agreed that he would do so for $100.00. Heath lived, with his wife, at Palestine, Arkansas, and Mrs. Snider went there after dark on the evening of May 31, 1969, at the agreed time, following him to his home. The witness said that Heath first stopped at a whiskey store; that she followed him inside, and heard him talking to someone on the telephone advising the party on the other end that he was bringing Mrs. Snider to the home. Company was at the house, along with a Miss Emily Strider, who was staying with the Heaths, and the visitors did not leave until about midnight. Mrs. Snider said that she noticed a box of syringes on the kitchen table. She described the steps taken by Heath and his wife, including the insertion of an instrument which was used for an examination. The witness stated that Heath used a crochet hook to insert a catheter, then used a cotton swab inside of her, and she began to bleed. He had first given her a shot of Vitamin B-12 and a slow acting penicillin

shot.[4] According to Mrs. Snider, Heath's wife prepared him two alcoholic beverage drinks during this period, and after he had finished, Heath told her that she would probably miscarry. She then went into a "cold sweat"; couldn't get her breath, and was literally gasping to the extent that Mr. Heath was frightened; he told his wife that they had better take her to the hospital. Heath, his wife, and Miss Strider then drove her to the hospital in Forrest City. Mrs. Snider said that when she left Palestine she still had the catheter in her, and it was still there when she reached the hospital, the nurse removing it. The witness told the nurse that she had had an abortion performed at Jonesboro and she (Mrs. Snider) testified that she told this at the suggestion of Heath who, on the way to the hospital, kept telling her "when you get to the hospital, tell them this was done in Jonesboro".

Dr. Herbert H. Hollis of Forrest City, testified that Mrs. Snider was admitted to the hospital on June 1, 1969, at 2:50 a.m.; that he had been called by Heath, who was one of his patients, and told there was a girl at his home that seemed to be having a penicillin reaction; the doctor was told that she had had an abortion at Jonesboro and that she had come to appellant's home and he had given her a shot of penicillin. The doctor said that Heath asked if she should be given a shot of Adrenalin, but he advised Heath to take her immediately to the hospital emergency room, and the doctor asked appellant why he was giving shots in his home. Hollis stated that he had found Mrs. Snider in a mild state of shock, complaining of abdominal cramping, and he removed a small rubber catheter from her, the catheter being taped to her leg; that the catheter was inserted into her vagina and was an attempt at an abortion. He said, however, that it appeared that there was insufficient penetration of the uterus to produce the abortion. Mrs. Snider testified that the attempted abortion took place sometime after midnight, but she was unable to more definitely fix the time. Dr. Hollis, when

---

[4]This penicillin was Ycillin, which the witness said was in Heath's refrigerator. She said she saw the box with the name on it.

asked if he could say how long the catheter had been in the body of Mrs. Snider before being removed, replied that it could have been days, or it could have been a matter of a few hours. He was of the opinion that it had been there more than 15 or 20 minutes. Appellant says that, according to Mrs. Snider's testimony, she was taken to the hospital as soon as she went into shock, the Heath home being located about 9 miles from the hospital, and it would have taken 15 or 20 minutes to arrive there. It is then asserted that Dr. Hollis's testimony shows that the catheter had been inserted several hours before, and that the conflict in the state's evidence establishes that the attempted abortion did not take place at the home of Heath, but is in line with the statement that she made upon reaching the hospital, and subsequently to the state police, that the abortion had been attempted in Jonesboro.

We do not agree with the conclusions reached by appellant. In the first place, the evidence on this particular point is quite vague. Mrs. Snider was only able to say that the attempt took place after midnight, occurring after the guests had left. She only mentioned one thing that was done before the catheter was inserted, that being that she was given two shots by appellant. Certainly, that would not have taken very long, and the record reflects that Dr. Hollis saw her about 3 a.m., or approximately three hours after the time, from the testimony, that the catheter could have been inserted. In addition, the doctor's testimony was far from positive; in fact he used the expression in estimating the time period, "My guess would be a few hours * * *". Of course, counsel for appellant might well argue to the jury that there was an inconsistency—but the determination of that fact was a jury matter, and it is evident from the verdict that the jurors were unanimously of the opinion that Heath inserted the catheter. A review of the testimony related under this point makes it evident that the evidence was ample to sustain a conviction.

Finally, it is contended that the court erred in allowing the prosecuting attorney to cross-examine Mrs.

Heath concerning certain obscene material. She was asked about the possession of photographs of nude men and women, some of the photographs depicting natural and unnatural sex acts. Defense counsel objected on the grounds that this was completely immaterial to the question of whether an abortion had been performed on Clara Snider. The court overruled the objection, holding the evidence admissible for the sole purpose of testing the credibility of the witness. Upon her answering that she was familiar with the photographs, she was then asked if any of the photographs contained pictures of sex acts by the witness. Counsel again objected on the basis of immateriality stating "It is purely for embarrassing the person". The objection was overruled, and the witness answered "Yes, sir". An objection was sustained to cross-examination concerning whether there were any similar pictures of the appellant. She was also asked concerning movie films similar to the photographs just mentioned, but she answered that she was not included in the films.

It is argued that appellant's rights under Amendments IV, V, and XIV to the Constitution of the United States were violated, it being contended that the knowledge obtained by the prosecutor which enabled him to propound these questions to the witness, was acquired by an illegal search of Heath's home. We do not agree. In the first place, there is absolutely no showing that this information was obtained by the prosecuting attorney as a result of any search made by officers. Nor was this the basis of any objection made by appellant to the questions concerning the pictures. Instead, he objected because of immateriality, and "embarrassment" of the witness. Let it be remembered that these questions on cross-examination were not asked of the appellant; rather, they were asked of Mrs. Heath, who was simply a witness on his behalf. This court has held over a long period of years that the credibility of a witness may be impeached by showing acts of moral turpitude. In *Kazzee* v. *State,* 199 S. W. 354 (not in Ark. Rpts.), we said:

"Amy Muyers testified as a witness in appellant's behalf, and certain questions were asked her on her

cross-examination tending to show immoral acts on her part, and exceptions were saved to the ruling of the court permitting this to be done. These questions were not improper, when asked upon the cross-examination of the witness, as they were circumstances affecting the credibility of the witness; the answer, whether true or false, being conclusive of this collateral issue."

Numerous Arkansas cases are cited in support of this holding.

On the whole case, we find no prejudicial nor reversible error.

Affirmed.