701 So.2d 338 (1997)
STATE of Florida, Petitioner,
v.
Kawana M. ASHLEY, Respondent.
Kawana M. ASHLEY, Petitioner,
v.
STATE of Florida, Respondent.
Nos. 87719, 87750.
Supreme Court of Florida.
October 30, 1997.
*339 Bernie McCabe, State Attorney; C. Marie King, Assistant State Attorney and Douglas R. Ellis, Assistant State Attorney, Sixth Judicial Circuit, Clearwater, for Petitioner.
Bruce Johnson, Public Defender, Sixth Judicial Circuit, Clearwater, and Priscilla J. Smith, New York City, for Respondent.
Andrew H. Kayton, Miami, for amicus curiae American Civil Liberties Union Foundation of Florida, Inc.
Lenora M. Lapidus of Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for amicus curiae ACLU Cooperating Counsel.
Louise Melling, New York City, for amicus curiae Reproductive Freedom Project American Civil Liberties Union Foundation.
PER CURIAM.
We have for review State v. Ashley, 670 So.2d 1087 (Fla.App. 2d DCA 1996), wherein the district court certified the following questions:
1. May an expectant mother be criminally charged with the death of her born alive child resulting from self-inflicted injuries during the third trimester of pregnancy?
2. If so, may she be charged with manslaughter or third-degree murder, the underlying predicate felony being abortion or attempted abortion?
Ashley, 670 So.2d at 1093. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We answer the first question in the negative as explained below, and this renders the second question moot. We quash Ashley in part.
Although Kawana Ashley, an unwed teenager, was in the third trimester of pregnancy (she was twenty-five or twenty-six weeks pregnant), she had told no one. Her three-year-old son was being raised by her grandmother, Rosa, with whom Ashley lived, and Rosa had told Ashley that she would not care for another child if Ashley were to become pregnant again. On March 27, 1994, Ashley obtained a gun and shot herself. She was rushed to the hospital, underwent surgery, and survived. The fetus, which had been struck on the wrist by the bullet, was removed during surgery and died fifteen days later due to immaturity.[1]
As a result of the death of the fetus, the State Attorney charged the teenager with alternative counts of murder[2] and manslaughter,[3] with the underlying felony for the *340 murder charge being criminal abortion.[4] The trial court dismissed the murder charge but allowed the manslaughter charge to stand. The State appealed and Ashley cross-appealed. The district court affirmed, certifying the above questions.
The State argues that Ashley was properly charged with both murder and manslaughter, reasoning thusly: Ashley violated the criminal abortion statute, section 390.001, Florida Statutes (1993), by performing a third-trimester abortion on herself with a .22 caliber firearm without certification of necessity by two physicians; because the fetus died as a result of the uncertified procedure, the teenager committed third-degree murder under section 782.04, Florida Statutes (1993); and further, because the fetus was born alive, Ashley committed manslaughter under section 782.07, Florida Statutes (1993). We disagree.
At common law, while a third party could be held criminally liable for causing injury or death to a fetus, the pregnant woman could not be:
At common law an operation on the body of a woman quick with child, with intent thereby to cause her miscarriage, was an indictable offense, but it was not an offense in her to so treat her own body, or to assent to such treatment from another; and the aid she might give to the offender in the physical performance of the operation did not make her an accomplice in his crime. The practical assistance she might thus give to the perpetrator did not involve her in the perpetration of his crime. It was in truth a crime which, in the nature of things, she could not commit.
State v. Carey, 76 Conn. 342, 56 A. 632, 636 (1904). Courts differentiated between those actions taken upon oneself and those taken by a third party:
Ordinarily, a man may injure his own body by his own hand or the hand of an agent, without himself violating the criminal law. And the person who injures his body with such assent may commit a crime of which the injured party is not guilty. A murderer cannot justify himself by proving the assent of his victim. Noninterference with a man's control of his person is not extended to the disposition of his life; but taking his own life is a thing distinct from the crime of murder. If a man in a moment of weakness should assent to the opening of a vein by another for the purpose of taking his life, and, when in the immediate expectation of death, make a statement of the facts attending the assault, it would hardly be claimed, upon trial of his assailant for felonious killing, that the dying declaration must be received with all the infirmities attending the testimony of an accomplice in the crime. This distinction between a man's injuring his own body himself, or through assent to such injury from another, and the crime that may be committed by another in inflicting such injury, has been strongly drawn in crimes akin to the one under discussion.
Carey, 56 A. at 635-36.
Ultimately, immunity from prosecution for the pregnant woman was grounded in the "wisdom of experience":

*341 While it may seem illogical to hold that a pregnant woman who solicits the commission of an abortion and willingly submits to its commission upon her own person is not an accomplice in the commission of the crime, yet many courts in the United States have adopted this rule, asserting that public policy demands its application and that its exception from the general rule is justified by the wisdom of experience.
Basoff v. State, 208 Md. 643, 119 A.2d 917, 923 (1956). The woman was viewed as the victim of the crime. See, e.g., Richmond v. Commonwealth, 370 S.W.2d 399, 400 (Ky. 1963) ("[S]he is a victim rather than an offender.").[5] The criminal laws were intended to protect, not punish her. See, e.g., Gaines v. Wolcott, 119 Ga.App. 313, 167 S.E.2d 366, 370 (1969) (noting that the criminal laws were designed for "the protection of ... pregnant females").[6]
The common law that was in effect on July 4, 1776, continues to be the law of Florida to the extent that it is consistent with the constitutions and statutory laws of the United States and Florida:
2.01 Common law and certain statutes declared in force.The common and statute laws of England which are of a general and not a local nature, with the exception hereinafter mentioned, down to the 4th day of July, 1776, are declared to be of force in this state; provided, the said statutes and common law be not inconsistent with the Constitution and laws of the United States and the acts of the Legislature of this state.
§ 2.01, Fla. Stat. (1993). Even where the legislature acts in a particular area, the common law remains in effect in that area unless the statute specifically says otherwise:
The presumption is that no change in the common law is intended unless the statute is explicit and clear in that regard. Unless a statute unequivocally states that it changes the common law, or is so repugnant to the common law that the two cannot coexist, the statute will not be held to have changed the common law.

Thornber v. City of Fort Walton Beach, 568 So.2d 914, 918 (Fla.1990) (emphasis added) (citations omitted).
In the present case, none of the statutes under which Ashley was charged "unequivocally" state that they alter the common law doctrine conferring immunity on the pregnant woman. See §§ 390.001, 782.04, 782.07, Fla. Stat. (1993). In fact, none even hint at such a change. Id. Nor are any of the statutes so repugnant to the common law that the two cannot coexist.[7] Accordingly, we conclude that the legislature did not abrogate the common law doctrine of immunity for the pregnant woman.
The State's reading of the present statutes has other flaws. First, the concept of a self-induced abortion via .22 caliber bullet is dubious in itself and is highly questionable *342 as a procedure intended to be regulated by section 390.001.[8] Second, prosecution for third-degree murder based on the unenumerated felony of criminal abortion is an oxymoroni.e., the third-degree murder statute requires an accidental killing,[9] while the criminal abortion statute requires an intentional termination of pregnancy.[10]'[11] Under the State Attorney's scenario, a woman could be charged with, and face imprisonment for, an "accidental intentional" crimewhatever that phrase might mean. And third, to allow prosecution for manslaughter would require that this Court extend the "born alive" doctrine[12] in a manner that has been rejected by every other court to consider it.[13]
Based on the foregoing, we answer the first certified question in the negative as explained herein, and this renders the second question moot. Under the current statutory scheme, the State Attorney for Pinellas County cannot prosecute the teenager in the present case, Kawana Ashley, for either murder or manslaughter. Sections 782.04 and 782.07 contain no indication whatsoever that the legislature intended to modify the common law principles adopted in section 2.01 by eliminating the immunity of the pregnant woman.
We reached a similar result in Johnson v. State, 602 So.2d 1288 (Fla.1992), wherein we held that a pregnant woman cannot be held criminally liable for passing cocaine in utero to her fetus. The relevant statutory section, we concluded, contained no indication of legislative intent to prosecute the woman.[14] Medical science prescribes rehabilitation, not imprisonment, for the offender:
[Various] considerations have led the American Medical Association Board of Trustees to oppose criminal sanctions for harmful behavior by a pregnant woman toward her fetus and to advocate that pregnant [offenders] be provided with rehabilitative treatment appropriate to their specific psychological and physiological needs.
Id. at 1296. This prescription for rehabilitation applies to not just the mature woman, but the wayward teenager as well.
Under Florida's constitutional form of government, no branch of state government can arrogate to itself powers that properly inhere in a separate branch.[15] Accordingly, we must decline the State Attorney's invitation to join in this fray. This Court cannot abrogate willy-nilly a centuries-old principle of the common lawwhich is grounded in the wisdom of experience and has been adopted by the legislatureand install in its place a *343 contrary rule bristling with red flags and followed by no other court in the nation. As we have said time and again, the making of social policy is a matter within the purview of the legislaturenot this Court:
[O]f the three branches of government, the judiciary is the least capable of receiving public input and resolving broad public policy questions based on a societal consensus.
Shands Teaching Hospital & Clinics, Inc. v. Smith, 497 So.2d 644, 646 (Fla.1986). Our review of the present record reveals no novel legislative intent to trump the common law and pit woman against fetus in criminal court.
We quash Ashley in part as explained herein.
It is so ordered.
OVERTON, SHAW, GRIMES and WELLS, JJ., concur.
HARDING, J., specially concurs with an opinion in which OVERTON, J., concurs.
ANSTEAD, J., concurs in result only.
HARDING, Justice, specially concurring.
I concur with the majority opinion and write only to emphasize a point made in Ashley's brief. In her brief, Ashley acknowledges that the legislature could criminalize her conduct, but it has not done so. As the majority opinion points out, in order to overturn a long standing common law principle, the legislature must enact a statute which would clearly overturn the common law either by specific language or by language so repugnant to the common law that both principles could not consistently stand. Majority op. at 341. The majority further notes that the states which have altered the common law to criminalize conduct like Ashley's "have done so explicitly." Id. at 341 n 7. Florida has not done so.
I believe that the circumstances of this case are tragic. However, I believe that it would be more tragic if this Court were so offended by Ashley's actions that we interpreted the statute in such a way as to abrogate the common law doctrine conferring immunity on the pregnant woman when the legislature has not acted to specifically change the common law.
In my judgment, such action by this Court would result in two wrongs. First, to interpret the statutes in order to criminalize Ashley's conduct would violate the constitutional guarantee against ex post facto laws. See U.S. Const., art. I, § 9; art. I, § 10, Fla. Const. Second, it is properly the function of the legislature, and not the court, to alter the common law in this respect.
The constitutional prohibition against ex post facto laws ensures that no person is prosecuted for conduct that occurred before a law prohibiting such conduct was enacted. This prohibition was incorporated in the United States Constitution as a remedy to one of the many abuses that American colonists had endured under the tyrannical English government. This prohibition satisfies a basic tenet of American due process: one must be given adequate notice as to the specific conduct prohibited by the law. This principle has endured for over two hundred years, and it is the continued adherence to such principles of law that has safeguarded our individual freedoms. In the instant case, the common law has conferred immunity on the pregnant woman from prosecution and Florida's statutory law has not explicitly changed that immunity. If a Florida statute had specifically proscribed Ashley's conduct before she acted, then due process would be satisfied. However, under the circumstances presented here, if we permit her prosecution for conduct that has historically been afforded immunity both due process and the prohibition on ex post facto laws would be violated.
As suggested in the briefs, criminalizing such actions by a pregnant woman raises a number of policy, social, moral, and legal implications. However, under our form of government, the appropriate place for those issues to be resolved is in the legislature. Accordingly, I concur with the majority opinion and defer to the legislature for consideration of this issue.
OVERTON, J., concurs.
NOTES
[1] Ashley gave conflicting reasons for her actions. She initially told officers that she had been the victim of a drive-by shooting, but later said she had shot herself "in order to hurt the baby." She told another officer, however, that she had not tried to kill the baby and wanted the baby, and told a friend that the gun had discharged accidently.
[2] Ashley was charged under section 782.04, Florida Statutes (1993), which proscribes murder in the third degree and states in relevant part:

(4) The unlawful killing of a human being, when perpetrated without any design to effect death, by a person engaged in the perpetration of, or in the attempt to perpetrate, any felony other than any:
(a) Trafficking ...
(b) Arson,
(c) Sexual battery,
(d) Robbery,
(e) Burglary,
(f) Kidnapping,
(g) Escape,
(h) Aggravated child abuse,
(i) Aircraft piracy, ... is murder in the third degree and constitutes a felony of the second degree....
§ 782.04, Fla. Stat. (1993).
[3] Ashley was charged under section 782.07, Florida Statutes (1993), which proscribes manslaughter and provides in relevant part:

782.07 Manslaughter.The killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable homicide or murder, according to the provisions of this chapter, shall be deemed manslaughter and shall constitute a felony of the second degree....
§ 782.07, Fla. Stat. (1993).
[4] Section 390.001, Florida Statutes (1993), governs the termination of pregnancy and provides in relevant part:

(2) TERMINATION IN LAST TRIMESTER; WHEN ALLOWED.No termination of pregnancy shall be performed on any human being in the last trimester of pregnancy unless;
(a) Two physicians certify in writing to the fact that, to a reasonable degree of medical probability, the termination of pregnancy is necessary to save the life or preserve the health of the pregnant woman; or
(b) The physician certifies in writing to the medical necessity for legitimate emergency medical procedures for termination of pregnancy in the last trimester, and another physician is not available for consultation.
(3) PERFORMANCE BY PHYSICIAN REQUIRED.No termination of pregnancy shall be performed at any time except by a physician as defined in this section.
....
(10) PENALTIES FOR VIOLATION.
(a) Any person who willfully performs, or participates in, a termination of a pregnancy in violation of the requirements of this section is guilty of a felony of the third degree....
(b) Any person who performs, or participates in, a termination of a pregnancy in violation of the provisions of this section which results in the death of the woman is guilty of a felony of the second degree....
§ 390.001, Fla. Stat. (1993).
[5] See also State v. Burlingame, 47 S.D. 332, 198 N.W. 824, 826 (1924) ("She should be regarded as the victim of the crime, rather than a participant in it."); Meno v. State, 117 Md. 435, 83 A. 759, 760 (1912) ("A woman on whom an abortion has been performed is regarded as a victim rather than an accomplice...."); Peoples v. Commonwealth, 87 Ky. 487, 9 S.W. 509, 510 (1888) ("She is looked upon rather as the victim than as a co-offender.").
[6] The perilous conditions prompting the laws are well known. See, e.g., Heath v. State, 249 Ark. 217, 459 S.W.2d 420, 421 (1970) (noting that the practitioner used "a crochet needle and a catheter"); Commonwealth v. Hersey, 324 Mass. 196, 85 N.E.2d 447, 450 (1949) (noting that the practitioner used "a tampon with a medication which had a dark color and a foul odor").
[7] Other states that have attempted to alter the common law in this regard have done so explicitly. Compare Cahill v. State, 84 Okla.Crim. 1, 178 P.2d 657, 658 (1947) (quoting a pre-Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), Oklahoma statute: "Every woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, unless the same is necessary to preserve her life, is punishable by imprisonment...."), with Guam Society of Obstetricians & Gynecologists v. Ada, 776 F.Supp. 1422, 1424 (D.Guam 1990) (quoting a post-Roe statute: "Every woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever with intent thereby to cause an abortion ... is guilty [of criminal abortion].").
[8] See generally § 390.001, Fla. Stat. (1993).
[9] See § 782.04, Fla. Stat. (1993) (proscribing "[t]he unlawful killing of a human being, when perpetrated without any design to effect death.").
[10] See § 390.001(10)(a), Fla. Stat. (1993) (providing punishment for "[a]ny person who willfully performs, or participates in, a termination of a pregnancy").
[11] Cf. Hieke v. State, 605 So.2d 983, 983 (Fla. 4th DCA 1992) ("In other words, under third degree, the death is accidental and while one can solicit the commission of a felony or solicit to kill anyone, there cannot be a solicitation to kill someone without any design to effect death because one cannot solicit an unintentional death. That is an oxymoron.").
[12] Under the "born alive" doctrine, a fetus that suffers a prenatal injury at the hands of a third party and is born alive is capable of supporting certain civil or criminal charges against the third party. See, e.g., Knighton v. State, 603 So.2d 71 (Fla. 4th DCA 1992) (applying the born alive rule to sustain a third-degree murder conviction against a defendant who shot a pregnant woman in the abdomen and the bullet lodged in head of the fetus which later died); Day v. Nationwide Mut. Ins. Co., 328 So.2d 560 (Fla. 2d DCA 1976) (applying the born alive rule to sustain a tort claim against a third party tortfeasor in an automobile accident wherein the fetus sustained cerebral injury).
[13] Ashley states in her brief: "Every court to address the issue has rejected the use of the born alive doctrine to hold a pregnant woman criminally liable for her prenatal conduct whether the woman is charged under homicide statutes or other criminal statutes." Ashley cites thirty-six cases in twenty-one states to support her point. The State Attorney, on the other hand, makes no substantive argument in opposition and cites no case in counterpoint.
[14] See § 893.13(1)(c)1, Fla. Stat. (1989).
[15] See art II, § 3, Fla. Const. ("No [entity] belonging to one branch [of government] shall exercise any powers appertaining to either of the other branches unless expressly provided herein.").