123 P.3d 1210

STATE of Hawai'i, Plaintiff–Appellee

v.

Tayshea AIWOHI, Defendant–Appellant.

No. 26838.

Supreme Court of Hawai'i.

Nov. 29, 2005.

As Corrected Dec. 12, 2005.

Todd Eddins, on the briefs, for defendant-appellant.

Glenn J. Kim, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., LEVINSON, J., concurring separately, with whom MOON, C.J., JOINS, and ACOBA, J., concurring separately.

Opinion of the Court by NAKAYAMA, J.

Defendant–Appellant Tayshea Aiwohi (hereinafter "Aiwohi") appeals from the First Circuit Court's October 4, 2004 judgment of conviction for manslaughter, in violation of Hawai'i Revised Statutes (hereinafter "HRS") § 707–702(1)(a) (1993), Judge Michael A. Town presiding.

Aiwohi gave birth to Treyson Aiwohi on July 15, 2001. Tragically, Treyson died two days later on July 17, 2001. Susan Siu, the Chief Investigator for the Department of the Medical Examiner, testified at the grand jury proceeding that Aiwohi admitted to smoking crystal methamphetamine on July 12, 13, 14, and 15. Dr. William Goodhue, First Deputy Medical Examiner of the City and County of Honolulu, testified at the grand jury proceed-

ing that the cause of Treyson's death was the toxic effects of methamphetamine. Aiwohi was thus indicted for manslaughter on October 9, 2003, for recklessly causing the death of her newborn son, Treyson Aiwohi.

On March 2, 2004, Aiwohi filed the following three motions with the circuit court: (1) "Motion to Dismiss Indictment Based on Insufficient and/or Impermissible Evidence Presented at the Grand Jury Proceedings"; (2) "Motion to Dismiss Based on the Unconstitutionally Vague and/or Overbroad Nature of the prosecution as Applied to the Defendant and/or the Unconstitutional Failure to Provide Fair Notice to the Defendant"; and (3) "Motion to Dismiss Indictment Based on Violation of the Defendant's Constitutional Right to Privacy." The circuit court denied all three motions. Aiwohi subsequently negotiated a conditional plea agreement with the State of Hawai'i (hereinafter "the prosecution") under which she entered a no contest plea to the charged offense, but reserved the right to appeal the denial of the foregoing motions.

On appeal, Aiwohi raises the following six issues: (1) whether Aiwohi's prosecution for manslaughter is within the plain meaning of HRS § 707–702(1)(a); (2) whether HRS § 707–702(1)(a), as applied to Aiwohi, fails to provide fair notice and is therefore unconstitutionally vague in violation of article I, section 5 of the Hawai'i Constitution; (3) whether HRS § 707–702(1)(a), as applied to Aiwohi, fails to provide fair notice and is therefore unconstitutionally vague in violation of the fourteenth amendment to the United States Constitution; (4) whether Aiwohi's prosecution for manslaughter interferes with an expectant mother's fundamental right to procreate, in violation of article I, section 6 of the Hawai'i Constitution; (5) whether Aiwohi's prosecution for manslaughter is an unconstitutional, retroactive expansion of HRS § 707–702(1)(a), in violation of the fourteenth amendment to the United States Constitution; and (6) whether Aiwohi was denied her right to present a defense, in violation of the sixth and fourteenth amendments to the United States Constitution, when the circuit court rejected Aiwohi's common law defense of immunity for an expectant mother's prenatal conduct.

## I. BACKGROUND

In the present case, Aiwohi pled no contest pursuant to a conditional plea agreement, and therefore there was no trial. As a result, there are no findings of fact. Accordingly, the following factual background will rely on the testimony provided by witnesses at the grand jury proceeding, as well as factual allegations made by the parties in their briefs found in the record on appeal.

At the time of the incident in question, Aiwohi was already the mother of four children. Aiwohi gave birth to her fifth child, Treyson, on July 15, 2001. At the time of Treyson's birth, Aiwohi already had a longstanding and well-documented history of substance abuse for which she had received treatment from various programs. Although Aiwohi was tested for substance abuse in various intervals, it appears that she was not tested in the weeks just prior to Treyson's delivery. After delivery, Aiwohi was allowed to breast feed the baby several times on July 15 and 16. The hospital discharged Aiwohi and Treyson on July 16, 2001 at approximately 7:00 p.m., and Aiwohi reported breast feeding the baby again at approximately 1:30 a.m. The family subsequently went to sleep.

Aiwohi subsequently reported that her husband woke her up and told her that Treyson wasn't breathing and that they needed to call 911. An ambulance then arrived, taking Treyson to the hospital. That morning, July 17, 2001, at approximately 6:32 a.m., Treyson Aiwohi was pronounced dead at Castle Medical Center.

The completed autopsy report revealed that the baby's death was caused by drugs. The autopsy report was prepared by the First Deputy Medical Examiner of the City and County of Honolulu, Dr. William Goodhue, who testified that the level of methamphetamine and amphetamine in Treyson's body was consistent with exclusive prenatal exposure through the mother. Dr. Goodhue also testified that there was no evidence of disease or disorder, or any evidence of acci-

dental death by suffocation caused by an adult sleeping in the same bed as the baby.

Subsequently, on August 29, 2001, the Chief Investigator for the Department of the Medical Examiner contacted Aiwohi by phone. The chief investigator specifically asked Aiwohi if she used crystal methamphetamine during her pregnancy, at which point Aiwohi began to cry and admitted to such use. Specifically, Aiwohi admitted to smoking crystal methamphetamine on July 12, 13, and 14, as well as one "hit" on July 15, the morning of the baby's birth. Following presentation of the case to the O'ahu Grand Jury on October 9, 2003, Aiwohi was indicted for the offense of manslaughter, in violation of HRS § 707–702(1)(a).

On March 2, 2004, Aiwohi filed the following three motions with the First Circuit Court: (1) "Motion to Dismiss Indictment Based on Insufficient and/or Impermissible Evidence Presented at the Grand Jury Proceedings"; (2) "Motion to Dismiss the Indictment Based on the Unconstitutionally Vague and/or Overbroad Nature of the prosecution as Applied to the Defendant and/or the Unconstitutional Failure to Provide Fair Notice to the Defendant"; and (3) "Motion to Dismiss Indictment Based on Violation of the Defendant's Constitutional Right to Privacy." The prosecution filed its memorandum in opposition on May 20, 2004.

On May 25, 2004, a hearing on Aiwohi's motions to dismiss was held. The circuit court considered the arguments presented by each counsel, and, on June 3, 2004, orally denied Aiwohi's three motions to dismiss the indictment. The circuit court also filed a written decision on June 3, 2004.

On June 17, 2004, pursuant to a conditional plea agreement, Aiwohi entered a plea of no contest to the charged offense of manslaughter. As part of the plea agreement, Aiwohi reserved the right to appeal the circuit court's denial of her three motions to dismiss the indictment. On August 25, 2004, the circuit court adjudged Aiwohi guilty as charged and sentenced her to a ten-year term of probation without incarceration.

On September 23, 2004, Aiwohi filed a timely notice of appeal. Subsequently, on October 4, 2004, the court filed an "Amended Judgment Guilty Conviction and Probation Sentence." On October 5, 2004, Aiwohi filed a timely amended notice of appeal.

## II. STANDARD OF REVIEW

In the present case, this court is faced with a question of statutory interpretation and questions of constitutional law. However, inasmuch as the plain language of the Hawai'i Penal Code (hereinafter "HPC") is dispositive, the only applicable standard of review is that with respect to questions of statutory interpretation. In *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (citations omitted), this court stated that "the interpretation of a statute . . . is a question of law reviewable de novo."

## III. DISCUSSION

### A. Whether Aiwohi's Prosecution for Manslaughter is Consistent With the Plain Meaning of HRS § 707–702(1)(a)

*1. Summary of Aiwohi's argument*

On appeal, Aiwohi argues that her manslaughter prosecution contravenes the plain meaning of HRS § 707–702(1)(a).

First, Aiwohi contends that her alleged prenatal conduct was directed at her fetus, which is not a "person" as required by the statute. For support, Aiwohi points to a decision of the Intermediate Court of Appeals (hereinafter "ICA") in *State v. Jardine*, 101 Hawai'i 3, 61 P.3d 514 (App.2002), in which the ICA evaluated a defendant's invocation of the defense of others with respect to an unborn child. The ICA stated that "unborn children are not 'natural persons' who can be victims of a crime unless the legislature expressly included them within the applicable definition." *Jardine*, 101 Hawai'i at 9–10, 61 P.3d at 519–520.

Second, Aiwohi contends that both the proscribed conduct and the proscribed result of conduct must occur when the object of that conduct and its result is presently a "person." Aiwohi argues that the circuit court improperly focused solely on the result of conduct element, "thereby ensnar[ing] *conduct* that is not perpetrated on a *person*."

For support, Aiwohi cites to *Collins v. State,* 890 S.W.2d 893 (Tex.Ct.App.1994), a decision by the Texas Court of Appeals. The *Collins* court stated that "the Penal Code does not proscribe any *conduct* with respect to a fetus, and the Legislature, by its definitions of 'child,' 'person,' and 'individual,' has specifically limited the application of [Texas'] penal laws to *conduct* committed against a human being who has been born and is alive." *Id.* at 897–898 (emphasis in original).

Third, Aiwohi contends that the HPC emphasizes the principles of strict statutory construction and the rule of lenity. Aiwohi contends that her prosecution for and conviction of manslaughter amounts to the creation of new criminal offenses perpetrated against the unborn.

In light of the foregoing, Aiwohi urges us to vacate the "Amended Judgment Guilty Conviction and Probation Sentence" filed on October 4, 2004, vacate the circuit court's decision and order denying Aiwohi's motions, and remand for dismissal of the indictment.

### 2. *Summary of the prosecution's argument*

In response, the prosecution argues that there is no violation of the plain language of the manslaughter statute.

First, the prosecution contends that although Aiwohi engaged in the proscribed conduct when Treyson was prenatal, there is no doubt that Treyson was born alive and was therefore indisputably a "person" at the time of his death. The prosecution thus argues that Treyson was a "person" within the definition supplied by the manslaughter statute and that the only remaining issue was Aiwohi's state of mind—an issue for the trier of fact at trial.

Second, the prosecution contends that Aiwohi is wrong in her assertion that she cannot be held criminally liable for Treyson's death merely because her alleged culpable conduct occurred prior to Treyson's birth. For support, the prosecution cites to another decision of the Texas Court of Appeals, *Cuellar v. State,* 957 S.W.2d 134 (Tex.Ct.App.1997). The *Cuellar* court assessed a third party's liability for manslaughter when the defen-

dant's car collided with another car driven by a mother who was seven and one-half months pregnant. *Cuellar,* 957 S.W.2d at 137. The fetus was born alive, but subsequently died due to injuries caused by the car accident. *Id.* The *Cuellar* court stated that "[i]t is axiomatic that a homicide conviction, requiring the death of the victim as an element of the offense, may stand even though the victim's death is not instantaneous with the defendant's conduct but results from that conduct at a later time." *Id.* at 139.

Thus, the prosecution urges us to affirm the circuit court's decision and order denying Aiwohi's respective motions to dismiss the indictment.

### 3. *The manslaughter prosecution of a mother for prenatal conduct that causes the death of a child subsequently born alive is not consistent with the plain meaning of the HPC.*

The prosecution essentially contends that Treyson was born alive and therefore qualifies as a "person" under HRS § 707–700 (1993), that Aiwohi's alleged voluntary ingestion of crystal methamphetamine while pregnant caused Treyson's death, and that, therefore, prosecution of Aiwohi for manslaughter is clearly consistent with the plain language of the statute. Although facially appealing, the prosecution's argument must fail because it does not fully account for the three material elements of the manslaughter offense.

#### a. *Requisite elements of manslaughter*

HRS § 707–702(1)(a) states that "[a] person commits the offense of manslaughter if . . . [h]e recklessly causes the death of another person." HRS § 707–702(1)(a). The HPC generally defines "person" as "any natural person." HRS § 701–118(7) (1993). Furthermore, for the purposes of HRS chapter 707, HRS § 707–700 defines "person" as "a human being who has been born and is alive." HRS § 707–700.

As a general rule, the essential elements of an offense are "such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as . . . [a]re specified by the definition of the offense, and . . . [n]egative a defense . . . ."

HRS § 702–205 (1993). Consequently, in order to satisfy the state of mind requirement, a person must act "intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense." HRS § 702–204 (1993). In the present case, the offense is manslaughter. Thus, the requisite state of mind is "recklessly." HRS § 707–702(1)(a). HRS § 702–206(3) (1993) defines the term "recklessly" as follows:

(a) A person acts recklessly with respect to his conduct when he consciously disregards a substantial and unjustifiable risk that the person's conduct is of the specified nature.

(b) A person acts recklessly with respect to attendant circumstance when he consciously disregards a substantial and unjustifiable risk that such circumstances exist.

(c) A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result.

HRS § 702–206(3)(a)–(c).

b. *With respect to the prosecution of mothers, most jurisdictions hold that conduct must occur at a time when the child has been born and is alive.*

An overwhelming majority of the jurisdictions confronted with the prosecution of a mother for her own prenatal conduct, causing harm to the subsequently born child, refuse to permit such prosecutions. *See People v. Morabito*, 151 Misc.2d 259, 580 N.Y.S.2d 843, 847 (N.Y.City.Ct.1992) (holding that the defendant mother could not be charged with endangering the welfare of a child based upon prenatal acts endangering an unborn child); *State v. Gray*, 62 Ohio St.3d 514, 584 N.E.2d 710, 713 (1992) (holding that a parent may not be prosecuted for child endangerment for prenatal substance abuse); *Collins*, 890 S.W.2d at 898 (holding that the defendant mother did not have notice that her voluntary, prenatal ingestion of cocaine could subject her to prosecution under the Texas injury to child statute); *Reinesto v. Superior Court of the State of Arizona*, 182 Ariz. 190,

894 P.2d 733, 738 (Ariz.Ct.App.1995) (holding that defendant mother could not be prosecuted under the child abuse statute for prenatal conduct that resulted in harm to the subsequently born child); *State v. Dunn*, 82 Wash. App. 122, 916 P.2d 952, 956 (1996) (dismissing the second degree criminal mistreatment of a child charge, holding that a fetus was not a child within the meaning of the criminal mistreatment statute); *State v. Ashley*, 701 So.2d 338, 342 (Fla.1997) (stating that to allow the manslaughter prosecution of a mother for prenatal conduct "would require that this Court extend the 'born alive' doctrine in a manner that has been rejected by every other court to consider it"); *State v. Deborah J.Z.*, 228 Wis.2d 468, 596 N.W.2d 490, 496 (1999) (holding that defendant mother's fetus was not a human being for the purposes of the attempted first degree intentional homicide and first degree reckless injury statutes); Carol Jean Sovinski, *The Criminalization of Maternal Substance Abuse: A Quick Fix to a Complex Problem*, 25 PEPP. L.REV. 107, 126–127 (1997) (summarizing *Mother Charged After Her Baby Dies of Cocaine*, N.Y. Times, May 10, 1989, at A18 (reporting that the county grand jury refused to indict defendant mother for involuntary manslaughter on the ground that the legislature did not intend for the manslaughter statute to impose criminal liability on women for prenatal conduct that caused the death of her subsequently born, two-day-old daughter)). The various analyses in these jurisdictions either expressly or impliedly rely upon the proposition that the conduct must be committed against a "person" or "child" as defined by the relevant statute.

In *Morabito*, a pregnant mother smoked cocaine, thereby causing her child to be born premature and with cocaine circulating in its blood system. *Morabito*, 580 N.Y.S.2d at 844. The mother was subsequently charged with the offense of endangering the welfare of a child, by "knowingly act[ing] in a manner likely to be injurious to the physical, mental, or moral welfare of a child. . . ." *Id.* The court stated that, in New York, there is no rule that a penal statute must be strictly construed against the accused, and that therefore the provisions "must be construed according to the fair import of their terms to

promote justice and effect the objects of the law." *Id.* at 845. The court reasoned that the intent of the legislature was clear from the language of the statute and that the term "child" necessarily excluded unborn children. *Id.* at 846. Therefore, in accordance with the fair import of the words, as well as legislative intent, the court held that the endangering the welfare of a child statute did not apply to the case at bar. *Id.* at 847. Implicit in the *Morabito* court's ruling was the proposition that the relevant proscribed conduct must be directed against a child who has already been born and is already alive.

In *Gray*, the defendant mother was charged with one count of child endangerment [1] for ingesting cocaine in her third trimester of pregnancy, which resulted in physical harm to the subsequently born child. *Gray*, 584 N.E.2d at 710. The trial court granted the mother's motion to dismiss, and the Court of Appeals for Lucas County affirmed. *Id.* On review, the Ohio Supreme Court began its analysis by stating that "[i]t is well recognized that the criminal statutes of the Revised Code are to be strictly construed against the state and liberally construed in favor of the accused." *Id.* at 711. The court subsequently concluded that a "review of the terms 'parent' and 'child' within their common usage supports the conclusion that R.C. 2919.22(A) does not proscribe the conduct at issue." *Id.* According to the court's reasoning, the mother "did not become a parent until the birth of the child. Furthermore, the child did not become a 'child' within the contemplation of the statute until she was born." *Id.* at 711. Thus, the fundamental concept implicit in the court's reasoning was that it was the victim's status at the time of the defendant's proscribed conduct that was determinative.

In *Collins*, the defendant mother smoked cocaine while pregnant, and her subsequently born child suffered pain from cocaine withdrawal. *Collins*, 890 S.W.2d at 895. Although the original indictment alleged injury to a child, *id.* at 896 n. 2, the prosecution proceeded on the lesser included offense of recklessly causing injury to a child. *Id.* at 896. The mother pled no contest, and the trial court convicted her of the charged offense. *Id.* On review, the Texas Court of Appeals, found it significant that "the Penal Code does not proscribe any conduct with respect to a fetus, and the Legislature, by its definitions of 'child,' 'person,' and 'individual,' has specifically limited the application of [Texas'] penal laws to conduct committed against a human being who has been born and is alive." *Id.* at 897–898. Furthermore, the court stated that:

> under the State's interpretation of Section 22.04, Appellant is subject to prosecution, even though her *conduct* was not an offense at the time it was committed, because the *result* of her conduct did not occur until after the child was born and became a person under Texas law. While the State's attempt to bring Appellant's conduct within the reach of Section 22.04 is creative, it ignores the fact that Appellant's conduct was not a crime when committed. Under Texas law, the elements of a criminal offense are: (1) the forbidden conduct, (2) the required culpability, (3) any required result, and (4) the negation of any exception to the offense. It is the stated purpose of the Penal Code to proscribe certain types of harmful *conduct*, not simply the *results* of conduct. While injury to a child is a "result of conduct" or "specific result" offense,[2] this does not mean that the actor is prosecuted for the result of the conduct, rather than the conduct itself. Instead, this means that the conduct must be done with the required culpability to effect the result the Legislature has specified, so that the culpable mental state relates to the result of the

---

1. The Ohio Supreme Court stated that the Revised Code of Ohio, section 2919.22(A), provides in relevant part:

   No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

   *Gray*, 584 N.E.2d at 711.

2. Our analysis of the HPC is somewhat more complex than this. *See infra* section III.A.3.d.

defendant's conduct, and not the nature of the conduct.

*Id.* at 898 (emphases in original). The court subsequently held that the statute was impermissibly vague as applied to the mother's conduct. *Id.* Thus, the Texas Court of Appeals, explicitly recognized the concept that the conduct must be perpetrated against a human being who has been born and is alive.

In *Reinesto,* the defendant mother ingested heroin during pregnancy and subsequently gave birth to a heroin-addicted child. *Reinesto,* 894 P.2d at 734. The indictment alleged that the mother knowingly caused injury to a child by ingesting heroin during pregnancy, in violation of Arizona Revised Statutes Annotated section 13–3623.B.1. *Id.* The mother filed a motion to dismiss or to remand for a redetermination of probable cause, contending that the term "child" was not adequately defined for the grand jury. *Id.* The mother also alleged that the legislature did not intend to encompass fetuses within the definition of "child" and that she did not receive fair warning that the statute applied to her conduct. *Id.* The trial court denied the mother's motions, but the mother filed a special action with the Arizona Court of Appeals and was granted review. *Id.* The court stated that the plain language of the statute does not support the mother's prosecution, reasoning that:

> the legislature intended to proscribe conduct by any *person* that causes physical harm to a *child.* Applying the ordinary meaning of these words leads us to conclude that the statute refers to conduct that directly endangers a child, not to activity that affects a fetus and thereby ultimately harms the resulting child.

*Id.* at 735 (emphases in original). Based on the foregoing, the court dismissed the indictment against the defendant mother. *Id.* at 738. Thus, the Arizona Court of Appeals explicitly endorsed the concept that the relevant proscribed conduct must be committed

against a child who has been born and is alive.

In *Dunn,* the defendant mother ingested cocaine during her pregnancy, and the newborn child tested positive for cocaine. *Dunn,* 916 P.2d at 953. The state subsequently charged the mother with second degree criminal mistreatment[3] of her viable unborn child, alleging that the mother "did recklessly create an imminent and substantial risk. of death or great bodily harm by taking cocaine during pregnancy after being warned by the doctor that it was harmful to the unborn child." *Id.* at 953. The trial court dismissed the charge, and the state appealed. *Id.* The Washington Court of Appeals held that the state "failed to name a victim that came within the protection of the criminal mistreatment statute and failed to allege or prove an essential element of the crime." *Id.* at 956. The court reasoned that no Washington criminal case had ever interpreted the term "person" to include an unborn child or fetus. *Id.* at 955. The court further stated that "[c]onsidering the Legislature's broad, almost plenary, authority to define crimes, the fact that it did not specifically define 'child' in RCW 9A.42.010(3) to include a fetus indicates it did not intend to depart from the typical definition of a child as a person from the time of birth to age 18." *Id.* Here, again, the concept that the conduct must be committed against a "child" was foundational to the court's logic and holding. It was not enough that the mother's alleged ingestion of cocaine created a substantial risk of death or great bodily harm to the subsequently born child. It was necessary that the mother's conduct be directed against a person who had been born and was under the age of 18. *See* discussion *supra.*

In *Deborah J.Z.,* the defendant mother was drinking at a local tavern, while pregnant, one week before her expected due date. *Deborah J.Z.,* 596 N.W.2d at 491. While at the tavern, the mother thought she was about to give birth and was taken to the

---

**3.** The state alleged that the mother's conduct violated the Revised Code of Washington section 9A.42.030(1), which states that "[a] parent of a child or the person entrusted with the physical custody of a child or dependent person is guilty of criminal mistreatment in the second degree if

he or she recklessly either (a) creates an imminent and substantial risk of death or great bodily harm, or (b) causes substantial bodily harm by withholding any of the basic necessities of life." *Dunn,* 916 P.2d at 953 n. 3.

hospital. *Id.* She allegedly told a nurse at the hospital that "if you don't keep me here, I'm just going to go home and keep drinking and drink myself to death and I'm going to kill this thing because I don't want it anyways." *Id.* After speaking with a physician, the mother consented to a caesarean section and gave birth to a baby girl. *Id.* The baby girl was extremely small and presented fetal alcohol defects. *Id.* at 491–492. The state subsequently charged the mother with attempted first degree intentional homicide and first degree reckless injury.[4] *Id.* at 492. The mother subsequently filed a motion to dismiss, which the trial court denied, and she then filed a petition to review the non-final order denying her motion. *Id.* On appeal, the mother argued that:

> the legislature did not intend to include the actions of a pregnant woman vis-á-vis her unborn child under either statute because they apply only to one who causes death or injury to another human being who has been born alive. Any intent or indifference that she may have manifested by her continued dependence on, and abuse of, alcohol during her pregnancy was directed toward her own body and the unborn child she carried within her, not toward another human being.

*Id.* at 493. The Wisconsin Court of Appeals accepted the mother's argument, stating that:

> according to the plain language of the first-degree intentional homicide and first-degree reckless injury statutes, *the legislature did not intend for these statutes to apply to actions directed against an unborn child.* The legislature clearly intended to exclude an unborn child when it limited the definition of a "human being"

---

**4.** Under Wisconsin law, (1) first degree intentional homicide is defined as "caus[ing] the death of another human being with intent to kill that person," (2) first degree reckless injury is defined as "caus[ing] great bodily harm to another human being under circumstances which show utter disregard for human life," and (3) the term "human being" is defined as "one who has been born alive." *Deborah J.Z.*, 596 N.W.2d at 492–493.

**5.** Section 20–7–50 of the South Carolina Code Annotated provides that:

to include only "one who has been born alive."

*Id.* (emphasis added) (citation omitted). Accordingly, the court concluded that probable cause did not exist to charge the mother with the crimes of attempted first degree intentional homicide and first degree reckless injury. *Id.* at 496. The court subsequently reversed the trial court's denial of the mother's motion to dismiss. *Id.* Thus, the Wisconsin Court of Appeals recognized the concept that the relevant proscribed conduct must be committed against a human being "who has been born alive." *Id.* at 493.

The one case cited by the parties that affirmed a mother's conviction for prenatal conduct that harmed her subsequently born child is *Whitner v. State*, 328 S.C. 1, 492 S.E.2d 777 (1997). In *Whitner*, the mother was charged with, and pled guilty to, the offense of criminal child neglect [5] for ingesting cocaine during her third trimester of pregnancy, thus causing the baby to be born with cocaine in its system. *Id.* at 778–779. The mother was convicted by the trial court, and she did not appeal her conviction. *Id.* Rather, the mother filed a petition for post-conviction relief, contending, among other things, that the circuit court lacked subject matter jurisdiction to accept a guilty plea to a nonexistent offense. *Id.* at 779. The trial court granted the mother's petition for post-conviction relief, but the South Carolina Supreme Court reversed, holding that the word "child" as used in the relevant statute included viable fetuses. *Id.* at 778–779. The court first looked to the plain language of the statute and South Carolina's policy concerning children, set forth in section 20–7–20(C) of the South Carolina Code, Annotated, as follows:

> [a]ny person having the legal custody of any *child* or helpless person, who shall, without lawful excuse, refuse or neglect to provide, as defined in § 20–7–490, the proper care and attention for such *child* or helpless person, so that the life, health or comfort of such *child* or helpless person is endangered or is likely to be endangered, shall be guilty of a misdemeanor and shall be punished within the discretion of the circuit court.

*Whitner*, 492 S.E.2d at 779 (emphases in original).

"It shall be the policy of this State to concentrate on the *prevention of children's problems* as the most important strategy which can be planned and implemented on behalf of children and their families." The abuse or neglect of a child at *any* time during childhood can exact a profound toll on the child herself as well as on society as a whole. However, the consequences of abuse or neglect which takes place after birth often pale in comparison to those resulting from abuse suffered by the viable fetus before birth. This policy of prevention supports a reading of the word "person" to include viable fetuses.

*Id.* at 780 (emphasis in original). The court reasoned that the plain language, when coupled with the foregoing policy, evidenced a clear legislative intent to include viable fetuses within the definition of "person." *Id.* at at 781. The court further reasoned that "South Carolina law has long recognized that viable fetuses are persons holding certain legal rights and privileges." *Id.* at 779. The court subsequently concluded that "it would be absurd to recognize the viable fetus as a person for purposes of homicide laws and wrongful death statutes but not for purposes of statutes proscribing child abuse." *Id.* at 780. The court distinguished other similar cases from other jurisdictions by simply stating that "the states in which these cases were decided have entirely different bodies of case law from South Carolina." *Id.* at 782. Accordingly, the South Carolina Supreme Court reversed the trial court's grant of the mother's petition for post-conviction relief. *Id.* at 786.

Although *Whitner* appears to contradict the trend of decisions issued by other jurisdictions, the dissenting justices in *Whitner* made compelling arguments that the majority's analysis was strained. Chief Justice Finney contended that "it is apparent from a reading of the entire statute that the word child in § 20–7–50 means a child in being and not a fetus." *Id.* (Finney, C.J., dissenting). The chief justice continued by arguing that the majority's analysis, at best, merely raised ambiguity as to whether viable fetuses were included within the term "child," and that "[e]ven if these wrongful death, common law, and Children's Code decisions [were] sufficient to render the term child in § 20–7–50 ambiguous, it is axiomatic that the ambiguity must be resolved in respondent's favor." *Id.* at 787 (Finney, C.J., dissenting). Justice Moore concurred with Chief Justice Finney's dissent, but wrote separately to point out that the legislative history contained persuasive evidence that the child abuse and neglect statute was not intended to apply. *Id.* (Moore, J., dissenting). Specifically, Justice Moore contended that the legislature repeatedly tried and failed to pass proposed bills addressing the problem of drug use during pregnancy and that such failure was sufficient evidence that the legislature did not intend that the child abuse and neglect statute be used to prosecute mothers for prenatal conduct. *Id.*

Thus, in summary, other jurisdictions overwhelmingly refuse to permit a mother's prosecution for prenatal conduct that causes harm to her newborn child, because the mother's conduct is not committed at a time when the child is born and is alive.

c. *With respect to the prosecution of third parties, most jurisdictions do not require that conduct be perpetrated against a person who has been born and is alive.*

On the other hand, an overwhelming majority of the jurisdictions confronted with the prosecution of a third party for conduct perpetrated against a pregnant mother, causing the death of the subsequently born child, uphold the convictions of the third parties. *See State v. Hammett,* 192 Ga.App. 224, 384 S.E.2d 220, 221 (Ga.1989) (holding that defendant who injured a pregnant woman such that her fetus, though born alive, subsequently died could be charged with the offense of vehicular homicide); *People v. Hall,* 158 A.D.2d 69, 557 N.Y.S.2d 879, 885 (App. Div.1990) (holding that the evidence established that the infant was born alive and thus was a "person" within the meaning of the homicide statute, and that defendant's manslaughter conviction for the death of the infant did not violate either due process or equal protection); *Cuellar,* 957 S.W.2d at 141 (affirming defendant's conviction for intoxication manslaughter for injuries suffered by

a fetus, who was born alive and subsequently died as a result of the accident injuries); *State v. Cotton,* 197 Ariz. 584, 5 P.3d 918, 925 (Ariz.Ct.App.2000) (holding that the homicide statutes apply to the killing of a child who is born alive, even if the death results from injuries inflicted before birth).

In *Hammett,* the defendant lost control of her car and collided with a vehicle in which a woman, thirty-five weeks pregnant, was a passenger. *Hammett,* 384 S.E.2d at 220. The expectant mother was immediately transported to the hospital and underwent an emergency caesarean section. *Id.* The newborn child lived for eleven hours before dying from the injuries received from the accident. *Id.* The defendant was charged with vehicular homicide,[6] but the trial court ruled that the baby was a fetus at the time of the accident (the time of the conduct) and that therefore the state failed to charge the defendant with a cognizable offense. *Id.* The state appealed the trial court's judgment, and the Georgia Court of Appeals reversed. *Id.* The court referred to the opinion of Sir Edward Coke in an old English common law case discussing the common law status of an unborn child, which states the following:

> [i]f a woman be quick with childe, and by a potion or otherwise killeth it in her wombe, or if a man beat her, whereby the childe dyeth in her body, and she is delivered of a dead childe, this is a great misprision, and no murder; but if the childe be born alive and dyeth of the potion, battery, or other cause, this is murder; for in law it is accounted a reasonable creature, *in rerum natura,* when it is born alive.

*Id.* at 221 (citations omitted). The court thus concluded that the victim's status at the time of death determines the crime, and not the victim's status at the time of the injury. *Id.* The court subsequently stated that "[n]othing in the OCGA § 40–6–393(b) limits consideration of the status of the victim to the moment at which the injury is inflicted, since the statute explicitly states that second degree vehicular homicide is committed when a

person '*causes the death* of another person.'" *Id.* (emphasis in original). The court found it persuasive that "there are many instances where an adult victim has died some considerable time after the infliction of the fatal blow or wound. If the victim recovers and survives, whether by reason of medical or surgical treatment, or otherwise, there is no homicide; yet if he dies from such wounds, it is murder." *Id.* (citing *State v. Anderson,* 135 N.J.Super. 423, 343 A.2d 505, 508 (1975).) Accordingly, the Georgia Court of Appeals reversed the judgment of the trial court. *Id.*

In *Hall,* the defendant got into an altercation with another customer at the grocery store. *Hall,* 557 N.Y.S.2d at 880. The defendant subsequently procured a gun and returned to the scene of the altercation. *Id.* When his target emerged, the defendant opened fire from across the street. *Id.* Although the defendant missed his target, two bullets struck a nearby pregnant mother in the arm and abdomen. *Id.* The mother underwent an emergency caesarean section, and her newborn baby lived for approximately thirty-six hours before it eventually died. *Id.* The defendant was charged with the murder, among other things, of the newborn infant. *Id.* Initially, a mistrial was declared because the jury was unable to reach a verdict, but in the second trial the defendant was found guilty of second degree manslaughter. *Id.* at 880–881. On appeal, the New York Supreme Court, Appellate Division, relied on the case law of other jurisdictions to support its conclusion that an individual can be convicted of homicide for injuries inflicted on a fetus that led to the death of the child subsequently born alive. *Id.* at 884–885. The court also rejected defendant's claim that the existing penal scheme did not give him fair notice in violation of his right to due process, stating that "[i]t is axiomatic that a perpetrator of illegal conduct takes his victims as he finds them, so it is entirely irrelevant whether defendant actually knew or should have know

---

**6.** The relevant vehicular homicide statute in Georgia states that "[a]ny person who causes the death of another person, without an intention to do so, by violating any provision of this title other than [certain code sections inapplicable

here] commits the offense of homicide by vehicle in the second degree when such violation is the cause of said death." Official Code of Georgia Annotated § 40–60393(b) (1974).

that a pregnant woman was in the vicinity and that her fetus could be wounded as a result of his actions." *Id.* at 885. Accordingly, the court affirmed the conviction. *Id.* at 886.

In *Cuellar,* the defendant, while drunk, drove his car into another car being driven by a woman who was seven and one-half months pregnant. *Cuellar,* 957 S.W.2d at 136. The mother subsequently underwent an emergency caesarean section and gave birth to a baby girl. *Id.* Although the baby was born alive, she eventually died as a result of the injuries suffered from the car accident, surviving for only forty-three hours after birth. *Id.* The defendant was subsequently charged with and convicted of the offense of intoxication manslaughter.[7] *Id.* The Texas Court of Appeals began by stating that the definition of the term "individual" as one who "has been born and is alive" is ambiguous as to what point in time the individual needs to have been born and be alive. *Id.* at 137. The court then stated that it was free to examine the common law in order to resolve the ambiguity. *Id.* Like the Georgia Court of Appeals in *Hammett,* the Texas Court of Appeals found the language of Sir Edward Coke[8] instructive. *Cuellar,* 957 S.W.2d at 137–138. The court was also persuaded by the analyses in *Hammett* and *Hall.*[9] *Id.* at 138. Accordingly, applying the statutory definition of "individual" to the facts, the court expressly held that the newborn infant was an "individual" under Texas criminal law. *Id.* at 140. The court thus rejected defendant's contention that the victim of the offense was a fetus at the time he engaged in his culpable conduct and was therefore not an "individual" within the meaning of the intoxication manslaughter statute. *Id.*

Despite the holding in *Cuellar,* its reasoning is questionable. To that effect, Justice Rodriguez wrote a cogent dissent, criticizing the "judicial activism" of the majority. *Id.* at 141–143 (Rodriguez, J., dissenting). Justice Rodriguez asserted that "[t]he penal code has not proscribed any conduct with respect to a fetus, and the legislature, by its definitions of "another," "person," and "individual" has specifically limited the application of [Texas] penal laws to conduct committed against a human being who has been born and is alive." *Id.* at 142 (Rodriguez, J., dissenting). Consequently, guided by the previous Texas Court of Appeals' decision in *Collins,* he concluded that "the legislature intended that any conduct proscribed by the penal code must occur against a victim who 'has been born and is alive' at the time the conduct occurs." *Id.* (citations omitted).

Finally, in *Cotton,* the defendant accidentally shot his girlfriend, who was eight and one-half months pregnant, in the back of the head. *Cotton,* 5 P.3d at 920. Although his girlfriend died, the baby was born alive. *Id.* However, the baby died one day later due to the lack of blood caused by the fatal injury to its mother. *Id.* The state charged defendant with two counts of reckless second degree murder, but the jury found defendant guilty of two counts of the lesser included offenses of reckless manslaughter. *Id.* On appeal, defendant argued, among other things, that the injury was inflicted on a fetus and therefore the victim was not a "person" within the meaning of the homicide statutes. *Id.* The Arizona Court of Appeals stated that "[t]he flaw in Cotton's reasoning is that Cotton caused the death not of a fetus, but of a child who had been born." *Id.* at 921. The court acknowledged the language in *Reinesto* and *Collins,* but distinguished those cases on the basis that they "focus[ed] on voluntary acts or choices by the mother that relate[d] to her health or well-being." *Id.* at 922. Thus, the court rejected defendant's argument and ultimately affirmed his conviction of reckless manslaughter. *Id.* at 925.

The foregoing cases illustrate a modern trend in other jurisdictions supporting the proposition that a third party may be prosecuted for conduct perpetrated against a preg-

---

7. The court characterized the elements of intoxication manslaughter as follows: "(1) a person (2) operating a motor vehicle in a public place (3) who is intoxicated, and (4) by reason of that intoxication causes the death of another." *Id.* at 140.

8. *See* discussion *supra.*

9. *See* discussion *supra* for the reasoning in *Hammett* and *Hall.*

nant mother that causes the death of the child subsequently born alive. These jurisdictions all focus on the victim's status at the time of death, as opposed to the victim's status at the time of the injury initially inflicted as a result of the defendant's conduct. *See* discussion *supra* at Part III.A.3.c.

Consequently, there appear to be two analytical approaches developing in other jurisdictions—one with respect to the prosecution of pregnant mothers for their own prenatal conduct, *see* discussion *supra* at Part III.A.3.b, and the other with respect to the prosecution of third parties for conduct perpetrated against pregnant mothers. *See* discussion *supra* at Part III.A.3.c. The difficulty lies in the fact that the logic of the two lines of cases are mutually exclusive. On the one hand, courts rejecting the prosecution of pregnant mothers hold that the conduct must be committed against a person who has been born and is alive. *See* discussion *supra* at Part III.A.3.b. On the other hand, courts upholding the prosecution of third parties hold that the conduct need not be directed against a person who has been born and is alive, so long as the result of the conduct (death) occurs with respect to a person who has been born and is alive. *See* discussion *supra* at Part III.A.3.c. The two propositions cannot logically coexist. Thus, it is difficult to reconcile the decisions of jurisdictions such as Arizona [10] and Texas,[11] that adopt both lines of reasoning.

Nevertheless, we are convinced that the jurisdictions requiring that conduct must be committed against a person who has been born and is alive state the more cogent rule. These jurisdictions all rely on the concept

that the defendant's conduct must occur at a time when the victim is within the class contemplated by the legislature. Although these decisions do not expressly articulate the underlying rationale for the aforementioned proposition, the Model Penal Code and its supporting commentary provide the missing link.

    d. *The Model Penal Code requires that the defendant's conduct must occur at a time when the victim is within the class contemplated by the legislature.*

Other jurisdictions addressing the present issue focus entirely on the "conduct" and "result" elements of the specific offense. An examination of the Model Penal Code and its commentary, however, suggests that it is more logically consistent to focus on the element of attendant circumstances.

■ Initially, we note that neither party referred in their briefing to the Model Penal Code or its commentary. However, the Hawai'i Penal Code and the Model Penal Code both state that conduct, attendant circumstances, and result of conduct, are the three material elements of any criminal offense.[12] The Hawai'i Penal Code is substantially derived from the Model Penal Code.[13] Accordingly, it is appropriate to look to the Model Penal Code and its commentary for guidance.

Comment 3 to section 2.02 of the Model Penal Code initially points out that "[t]he distinction between conduct and attendant circumstance or result is not always a bright one, so the attempt to draw a line involves difficult and unnecessary problems of draft-

---

**10.** *See* discussion *supra* of *Reinesto; but see* discussion *supra* of *Cotton.*

**11.** *See* discussion *supra* of *Collins; but see* discussion *supra* of *Cuellar.*

**12.** Section 1.13(9) of the Model Penal Code states that the term " "element of an offense" means (i) such conduct or (ii) such attendant circumstances or (iii) such a result of conduct as (a) is included in the description of the forbidden conduct in the definition of the offense; or (b) establishes the required kind of culpability; or (c) negatives an excuse or justification for such conduct; or (d) negatives a defense under the statute of limitations; or (e) establishes jurisdic-

tion or venue." MODEL PENAL CODE § 1.13(9) (1962).

**13.** The commentary to section 2.02 of the Model Penal Code states that many jurisdictions have accepted the Model Penal Code's formulation of recklessness, and subsequently lists Hawai'i among those jurisdiction in a footnote. MODEL PENAL CODE § 2.02 cmt. at 3 n. 18 (1962). Furthermore, this court has acknowledged that "the Model Penal Code (MPC), as adopted at the 1962 annual meeting of The American Law Institute, was 'used by the Judicial Council of [Hawai'i] as the guide for the [HPC].' " *State v. Gaylord,* 78 Hawai'i 127, 140 n. 22, 890 P.2d 1167, 1180 n. 22 (1995) (citations omitted).

ing or interpretation." MODEL PENAL CODE § 2.02 cmt. at 3 (1962). Thus, the commentary indicates that it is often difficult and unnecessary to distinguish among the three elements. Nevertheless, the commentary provides the following two examples to illustrate how the three elements are generally classified:

A Senate Judiciary Committee Report gives some examples as to how offense elements are classified, not all of which are obvious. It says:

section 1714 provides that a person is guilty of an offense "if, with intent to obtain transportation, he secretes himself aboard . . . a vessel or aircraft that is the property of another and is aboard when it leaves the point of embarkation." The culpability level for the conduct, i.e., secreting oneself aboard a vessel or aircraft, is "knowing"; the culpability level attaching to the existing circumstances that the vessel or aircraft is the property of another and that the actor is aboard at the time of its departure is, by contrast, set at the lower level of "reckless". The phrase "with intent to obtain transportation" does not describe a general state of mind, but rather a specific purpose for which the conduct is done.

Sen. Judiciary Comm. Report 53 (S.1, 1975) (footnote omitted).

It analyzes a second crime in the following way:

18 U.S.C. 111 makes assault on a Federal officer engaged in the performance of his duties a felony. In the past the courts have split on the question whether it is necessary to show that a person charged under this section knew that the person he was assaulting was a Federal officer. . . . Instead, the standard would be reckless because the element, "a Federal officer," is an attendant circumstance.

*Id.* [at] 59–60.

MODEL PENAL CODE § 2.02 cmt. at 3 n. 22. In the first example, the attendant circumstances are that the vessel or aircraft is the property of another and that the actor is aboard at the time of departure. In the second example, the attendant circumstance is that the person assaulted is a federal officer. Although the Model Penal Code does not define the term "attendant circumstance," it has been proposed that an attendant circumstance is essentially a circumstance that "exist[s] independently of the [actor's conduct]." Audrey Rogers, *New Technology, Old Defenses: Internet Sting Operations and Attempt Liability*, 38 U. RICH. L.REV. 477, 485 (2004) (citing R.A. Duff, *The Circumstances of an Attempt*, 50 CAMBRIDGE L.J. 100, 104 (1991)). The ICA also applied a similar definition in *State v. Moser*, 107 Hawai'i 159, 172, 111 P.3d 54, 67 (2005), stating that "[a]ny circumstances defined in an offense that are neither conduct nor the results of conduct would, by default, constitute attendant circumstances elements of the offense." *Id.*

In the present case, a person is guilty of the offense of manslaughter if that person "recklessly causes the death of another person." HRS § 707–702(1)(a). Thus, applying the aforementioned definition of an "attendant circumstance," the conduct is any voluntary act or omission, the result is death, and the attendant circumstance is "of another *person.*" HRS § 707–702(1)(a) (emphasis added). *Cf. State v. Jenkins*, 93 Hawai'i 87, 112–113, 997 P.2d 13, 38–39 (2000) ("[F]or the purposes of HRS § 134-6(e) [ (1993 & Supp.1999), *i.e.,* "Carrying or use of firearm in the commission of a separate felony,"] 'carry' must be analyzed employing a two-pronged analysis: (1) the voluntary act of 'carrying' an object is, by way of HRS § 702–202, established when an individual acts knowingly with respect to that *conduct;* and (2) the *circumstances attendant* to 'carrying' that object, *i.e.* the object's *particular attributes rendering its carrying a criminal offense—in this case, the quality of being a firearm*—is, by way of HRS § 702–204 established by proof of a reckless state of mind." (Emphases added)); *State v. Valentine*, 93 Hawai'i 199, 207, 998 P.2d 479, 487 (2000) ("Pursuant to HRS § 702–205 (1993), '[t]he elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct[ ] as . . . [a]re specified by the [statutory] definition of the offense.' For purposes of HRS § 134–7(b) [ (1993 & Supp.

1997), i.e., "ownership or possession prohibited, when,"] as it pertains to the present matter, is comprised of the following elements: (1) that a person convicted of a felony (*attendant circumstance*); (2) possesses or controls an object (*conduct*); (3) *exhibiting the attributes of a firearm* (*attendant circumstance*)[; and] (4) that the person does so intentionally, knowingly, or recklessly." (Some brackets added and some in original) (Ellipses points in original) (Emphases added)).

As a result of this classification, Aiwohi did not have the requisite state of mind. In order to be guilty of manslaughter, Aiwohi must have "acted ... recklessly ... with respect to each element of the offense." HRS § 702–204. With respect to the attendant circumstance element, HRS § 702–206(3)(b) states that "[a] person acts recklessly ... when he consciously disregards a substantial and unjustifiable risk that such circumstances *exist*." *Id.* (emphasis added). In the present case Aiwohi simply could not have disregarded a substantial and unjustifiable risk that the requisite circumstance existed, because the requisite circumstance did not exist at the time she engaged in what the prosecution claims was culpable conduct. More specifically, there was no other "person" at the relevant time because a fetus is not a "person" within the plain meaning of the statute, as discussed *infra*. The mere fact that the fetus would later be Treyson, another person, does not alter the conclusion. The plain language of the statute clearly requires that the actor disregard a substan-

tial and unjustifiable risk that such circumstances *presently exist*, not that such circumstances *might later exist.*[14]

■ Consequently, speaking in terms of attendant circumstances, we hold, in the context of offenses against persons set forth in HRS chapter 707, that the defendant's proscribed conduct must be committed at a time when the victim is within the class contemplated by the legislature because the specified class is an attendant circumstance. As applied to reckless manslaughter, the actor must disregard a substantial and unjustifiable risk that the attendant circumstance exists, and therefore, *a fortiori*, the attendant circumstance must exist at the time of the conduct's commission. Accordingly, in the present case, the proscribed conduct must have been committed at a time when Treyson qualified as a "person," defined by the Hawai'i Penal Code as "[a] human being who has been born and is alive." HRS § 707–700.[15]

e. *According to the plain language of the HPC, a fetus is not included within the definition of "person."*

■ Having established that the offense of reckless manslaughter contains a conduct element and that the conduct must be directed against a "person," the final sub-issue is whether the HPC's definition of "person" includes a fetus. We hold that it does not.

■ According to HRS § 701–104 (1993), "[t]he provisions of [the HPC] cannot be

14. We note that in its appellate brief, and also at oral argument, the prosecution mentioned that there may be an issue as to whether the manslaughter offense, as codified in HRS § 707–702(1)(a), actually contains an attendant circumstance element. For support, the prosecution relied on our prior statement in *State v. Aganon*, 97 Hawai'i 299, 303, 36 P.3d 1269, 1273 (2001), that "the two elements of second degree murder in this case are 'conduct' ... and 'result.'" However, as noted by Justice Levinson in his concurring opinion, *Aganon* does not properly stand for the proposition that we may abolish the attendant circumstance element from the offense of reckless manslaughter, an element expressly required by the plain language of the HPC. Justice Levinson's concurring opinion, at 132, 33, 123 P.3d at 1227–28. Rather, inasmuch as "the elemental status of 'personhood'" was not at issue in *Aganon*, we failed to adequately extract it

from the conduct and result of conduct elements of the offense of second degree murder. *Id.* at 132, 123 P.3d at 1227. Nevertheless, as Justice Levinson candidly suggests, we now have occasion to redeem our prior "analytical sin." *Id.* at 132, 123 P.3d at 1227.

15. The logical implication is that third party conduct that occurs against a pregnant woman, causing the death of her child subsequently born alive, also cannot be prosecuted under the manslaughter statute, inasmuch as the legislature has not included fetuses within the definition of the term "person." To conclude otherwise would require us to subvert the plain meaning of the statute and render an inconsistent holding in order to produce a desired result. However, we need not delve any deeper into this issue as it is not before us today.

extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and effect the objects of the law, all of its provisions shall be given a genuine construction, *according to the fair import of the words, taken in their usual sense,* in connection with the context, and with reference to the purpose of the provision." HRS § 701–104 (emphasis added). Furthermore, this court has declared that a criminal statute "must be strictly construed and that it cannot be extended beyond the plain meaning of the terms found therein." *State v. Johnson,* 50 Haw. 525, 526, 445 P.2d 36, 37 (1968) (citing *Territory v. Balarosa,* 34 Haw. 662, 665–666 (1938)). That declaration is consistent with the legislature's statement that "definitions of crimes are to be strictly construed." Sen. Conf. Comm. Rep. No. 1–72, in 1972 Senate Journal, at 734. Thus, in the present case, we interpret the relevant provisions of the HPC in accordance with the foregoing maxims of statutory construction.

According to the "fair import of the words, taken in their usual sense," HRS § 701–104, a fetus is clearly not one "who has been born and is alive." HRS § 707–700. The plain language of the statute is clear and unambiguous, and therefore we need not go any further. *See State v. Haugen,* 104 Hawai'i 71, 76, 85 P.3d 178, 183 (2004) (stating that "[i]t is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning").

Even if, *arguendo,* the statutory language were perceived to be ambiguous, the term "person" may not be construed so as to include fetuses. Where statutory language is ambiguous, HRS § 1–15 (1993) directs this court to look to "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it...." HRS § 1–15. In the present case, there is nothing in the legislative history indicating that the legislature intended to include fetuses within the definition of the term "person." In the absence of clear statutory language, and with no legislative guidance vis-á-vis legislative history, the applicable doctrine is the rule of lenity. *See State v. Shimabukuro,* 100 Hawai'i 324, 327,

60 P.3d 274, 277 (2002) (stating that "[w]here a criminal statute is ambiguous, it is to be interpreted according to the rule of lenity"); *State v. Kaakimaka,* 84 Hawai'i 280, 292, 933 P.2d 617, 629 (1997) (stating that "[a]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity") (citations omitted). Consequently, even if the language were viewed as ambiguous, the statute would still have to be strictly construed in favor of Aiwohi and against the prosecution.

Finally, it is important to clarify that we are dealing strictly with an issue of statutory interpretation in the present appeal. Although we recognize that there may be significant policy implications and social ramifications surrounding the present issue, it is well established that the legislature is best suited to assess such considerations. *See State Farm Mut. Auto. Ins. Co. v. Gepaya,* 103 Hawai'i 142, 152, 80 P.3d 321, 331 (2003) (stating that "such policy decisions are expressly within the constitutional purview of the legislature"); *Jardine,* 101 Hawai'i 3, 10, 61 P.3d 514, 521 (observing that "[w]hile there may be sound policy reasons to allow a choice of evils justification defense for the protection of unborn children, the adoption of such a public policy is best left to the state Legislature"); *In Re Water Use Permit Applications,* 94 Hawai'i 97, 192, 9 P.3d 409, 504 (2000) (stating that "the 'how' or the public policy making function was properly reserved for the legislature"); *Lee v. Corregedore,* 83 Hawai'i 154, 171, 925 P.2d 324, 341 (1996) (stating that broad policy decisions are "best left to the branch of government vested with the authority and fact finding ability to make such broad public policy decisions, namely the Hawai'i Legislature").

Therefore, we hold that, according to the plain language of the HPC, a fetus is not included within the definition of the term "person."

**B. Resolution of the First Issue Disposes of the Case**

Although Aiwohi advances several other arguments challenging the constitutionality of her prosecution under HRS § 707–702(1)(a), we need not address them in this

opinion. Specifically, as we have noted, Aiwohi contends that: (1) HRS § 707–702(1)(a) fails to provide fair notice and/or is unconstitutionally vague in violation of article I, section 5 of the Hawai'i Constitution; (2) HRS § 707–702(1)(a) fails to provide fair notice and/or is unconstitutionally vague in violation of the fourteenth amendment to the United States Constitution; (3) Aiwohi's prosecution for manslaughter interferes with an expectant mother's fundamental right to procreate, in violation of article I, section 6 of the Hawai'i Constitution; (4) Aiwohi's prosecution for manslaughter is an unconstitutional, retroactive expansion of HRS § 707–702(1)(a), in violation of the fourteenth amendment to the United States Constitution; and (5) Aiwohi was denied her right to present a defense, in violation of the sixth and fourteenth amendments to the United States Constitution, when the circuit court rejected Aiwohi's common law defense of immunity for an expectant mother's prenatal conduct.

Inasmuch as our holding—that Aiwohi's prosecution for the offense of manslaughter is unsupported by the plain language of the HPC—is dispositive, it is unnecessary to address Aiwohi's remaining constitutional arguments.

## IV.  CONCLUSION

Based on the foregoing analysis we hold that a mother's prosecution for her own prenatal conduct, which causes the death of the baby subsequently born alive, is not within the plain meaning of HRS § 707–702(1)(a), in conjunction with the general provisions of penal liability found in the HPC. Therefore the circuit court erred when it denied Aiwohi's "Motion to Dismiss Indictment Based on Insufficient and/or Impermissible Evidence Presented at the Grand Jury Proceedings." Accordingly, we reverse the "Amended Judgment Guilty Conviction and Probation Sentence" filed on October 4, 2004.

Concurring Opinion by LEVINSON, J., with whom MOON, C.J., joins.

I join in the opinion of the court and agree with its reasoning and analysis. I write ad-ditionally, however, to respond to Justice Acoba's reliance, which I believe is misguided, upon three sentences appearing in *State v. Aganon,* 97 Hawai'i 299, 36 P.3d 1269 (2001), as support for his position that "[t]he term person ... should not be excised from the result of conduct element [of the offense of manslaughter, in violation of Hawai'i Revised Statutes (HRS) § 707–702(1) (1993),] and denominated as a separate attendant circumstance as the majority proposes." Justice Acoba's concurring opinion, at 133–34, 123 P.3d at 1228–29.

The defendant in *Aganon* was a licensed child care provider, who was charged with and convicted of the second degree murder of a six-month-old child, whom the defendant had been hired by the child's parents to care for during the weekdays. *Aganon,* 97 Hawai'i at 300, 36 P.3d at 1270. To put the *Aganon* decision in proper perspective for present purposes, I quote it at length but nevertheless in relevant part:

> After closing arguments, the circuit court instructed the jury on murder in the second degree:
>
>> The defendant is charged with the offense of Murder in the Second Degree. A person commits the offense of Murder in the Second Degree if she intentionally or knowingly causes the death of another person. There are two material elements of the offense of Murder in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.
>>
>> These two elements are[:] (1), that on or about the 21st day of October, 1997, to and including the 24th day of October, 1997, on the island of Oahu, in the City and County of Honolulu, State of Hawaii, [Aganon] caused the death of Karie Canencia. And, (2), that [Aganon] did so intentionally or knowingly.
>>
>> . . . .
>>
>> A person acts intentionally with respect to her conduct when it is her conscious object to engage in such conduct.
>>
>> *A person acts intentionally with respect to attendant circumstances when she is aware of the existence of such*

*circumstances or believes or hopes that they exist.*

A person acts intentionally with respect to a result of her conduct when it is her conscious object to cause such a result.

A person acts knowingly with respect to her conduct when she is aware that her conduct is of that nature.

*A person acts knowingly with respect to attendant circumstances when she is aware that such circumstances exist.*

A person acts knowingly with respect to a result of her conduct when she is aware that it is practically certain that her conduct will cause such a result.

. . . .

During jury deliberations, the jury sent the following communication to the judge:

Regarding definitions of intentionally and knowingly in the instructions, three conditions/definitions are present for each word. Must all three be true, or is agreement with one of the three sufficient to be so defined?

With no objection from Aganon, the judge responded, "Unanimous agreement with one of the three is sufficient."

The jury found Aganon guilty as charged.

. . . .

Aganon argues that the circuit court failed to properly instruct the jury that, in order to find her guilty of second degree murder, it must unanimously find the requisite state of mind was present with respect to (1) her conduct, (2) *the attendant circumstances,* and (3) the result of her conduct. Instead, the court erred by informing the jury that it need only have "unanimous agreement with one of the three."

HRS § 701–114 (1993) specifies that "no person may be convicted of an offense unless . . . [t]he state of mind required to establish *each element of the offense*" is proven beyond a reasonable doubt. (Emphasis added.) Similarly, HRS § 702–204 (1993) provides that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negli-

gently, as the law specifies, with respect to *each element of the offense.*" (Emphasis added.) In turn, HRS § 702–205 (1993) identifies the elements of an offense to be:

such (1) conduct, (2) attendant circumstances, and (3) results of conduct as:

(a) *Are specified by the definition of the offense,* and

(b) Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction).

(Emphasis added.) . . . [T]he totality of these various items—the proscribed conduct, attendant circumstances, and the specified result of conduct, when specified by the definition of the offense, constitute the "elements" of an offense. HRS § 702–205.

Pursuant to HRS § 707–701.5, a person commits the offense of murder in the second degree when the "person intentionally of knowingly causes the death of another person." *Any voluntary act (e.g., physical abuse) or omission may satisfy the conduct element of the offense. The death of another person, as the intentional or knowing result of the conduct, constitutes the result element of the offense.*

The circuit court's response to the jury's communication was erroneous. The jury, for example, could have found that Aganon possessed the requisite state of mind with respect to her conduct (*physical abuse of Karie*), *but not with respect to the death that resulted.* By virtue of the circuit court's erroneous response to the jury's question, the jury could have found Aganon guilty of second degree murder, even though it did not find the requisite state of mind with respect to "each element of the offense." HRS § 702–204. Thus, the court's error adversely affected Aganon's substantial rights and, as such, constituted plain error. Accordingly, we vacate Aganon's conviction and sentence and remand for a new trial consistent with this opinion.

In order to provide guidance to the circuit court on remand, we examine Aganon's remaining arguments on appeal.

. . . .

... [T]he two elements of second degree murder in this case are "conduct" (*Aganon intentionally or knowingly abused Karie*) and "result" (*Aganon intended or know that death would result*)....

Aganon's third and fourth arguments relate to the circuit court's allowing the jury to find Aganon guilty based on only one element of the offense so long as it was accompanied by the requisite state of mind. Given the jury's communication regarding the necessity of finding the state of mind with respect to all elements, we cannot say that the jury instructions did not adversely affect Aganon.... Thus, the court's jury instructions were plainly erroneous.

97 Hawai'i at 301–04, 36 P.3d at 1271–74 (footnote and citations omitted) (some emphases added and some in original) (some brackets and ellipsis points added and some in original).

Read in context, the holding of *Aganon* is unmistakable: HRS §§ 701–114 and 702–204 mean exactly what they say. No person may be convicted of an offense unless the state of mind required to establish each element of the offense is proved beyond a reasonable doubt, and, conversely, a person is not guilty of an offense unless the person possessed the prescribed requisite state of mind with respect to each element of the offense. That being so, it is harmful error for the trial court to instruct the jury that it may convict based upon a finding of the requisite state of mind as to a single, but less than all, elements of the offense in question. As it pertains to the present matter, *Aganon* stands for no more and no less.

I note that, in instructing the jury regarding the elements of second degree murder in *Aganon*, the circuit court expressly enumerated the requisite states of mind with respect to conduct, attendant circumstances, and result of conduct, tracking the language of HRS § 702–206(1) and (2) (1993), and thereby clearly implying that the elements of second degree murder encompassed all three. 97 Hawai'i at 301–02, 36 P.3d at 1271–72. A close reading of the language from *Aganon* quoted above, however, reveals a curious cognitive dissonance, elementally speaking, on this court's part, about the personhood component of the second degree murder statute. In retrospect, and stated baldly, the *Aganon* court was unsure precisely where to place Karie Canencia, the young "person" whose death the defendant intentionally or knowingly caused, within the schematic diagram of the offense's statutory elements. I suggest that in the hierarchy of analytical sins, ours was a forgivable one, considering that no party disputed that Karie was a "person," within the meaning of HRS § 707–700 (1993), at all times relevant to the defendant's prosecution. Accordingly, as I will demonstrate that the language of the *Aganon* decision plainly reflects, we were not focusing specifically on the elemental status of "personhood" because that issue was not terribly germane to our analysis. Nevertheless, had we been more careful and precise in our thinking, there would be no need for me to write this concurring opinion.

At one point, as Justice Acoba notes at 134, 123 P.3d at 1229 of his concurring opinion, we identified "physical abuse" as the voluntary act constituting the conduct element of the second degree murder statute and "[t]he death of another *person*" (emphasis added) as the result of conduct of the offense, thereby placing Karie within the result of conduct element. *Aganon*, 97 Hawai'i at 303, 36 P.3d at 1273. But in the very next paragraph, we described the defendant's conduct as "physical abuse of Karie" and the result of conduct as "the death," thereby placing Karie squarely within the conduct element. *Id.* Then, three paragraphs later, we did the same thing, referring to the defendant's conduct as "intentionally or knowingly abus[ing] Karie" and the result of her conduct as "intend[ing] or kn[owing] that death would result[ ]," thereby placing Karie once again within the conduct element of second degree murder. *Id.*

As the opinion of the court ably demonstrates, Treyson Aiwohi, for purposes of "personhood" analysis, belongs in neither the conduct or result of conduct element, but falls most satisfactorily within the realm of an attendant circumstance. It is in this connection that *State v. Jenkins*, 93 Hawai'i 87, 112–13, 997 P.2d 13, 38–39 (2000), and *State*

*v. Valentine,* 93 Hawai'i 199, 207, 998 P.2d 479, 487 (2000), are particularly helpful. Just as the attribute of being a firearm—an attendant circumstance—rendered the conduct of "carrying" or "possessing" an object criminal offenses in those cases, so the attribute of "personhood"—an attendant circumstance—renders "death"—the result of the relevant conduct (any voluntary act or omission) criminally culpable for purposes of reckless manslaughter and the other homicide statutes enumerated in the Hawai'i Penal Code. Opinion of the court, op. at 127–28, 123 P.3d at 1222–23. Our mistake in *Aganon* was in failing to detach the "personhood" ion, as an attendant circumstance element, from the conduct and result of conduct ions of the second degree murder statute.

## Concurring Opinion by ACOBA, J.

I concur in the result reached by the majority but on the grounds that (1) as applied to this case, an ordinary reading of the words in Hawai'i Revised Statutes (HRS) § 707–702(1)(a) (1993) indicates that the culpable conduct must be aimed at a living person and fails to evince any legislative intent to impose criminal liability on a pregnant woman whose self abusive conduct results in the death of a baby born alive, (2) assuming, *arguendo,* any doubt exists as to the construction of HRS § 707–702(1)(a), under our penal code the statute must be given a strict reading in favor of Defendant–Appellant Tayshea Aiwohi (Defendant), and (3) in any event, to construe the statute otherwise would render it vague and ambiguous, in violation of the due process clause, article I, section 5, of the Hawai'i Constitution as to a pregnant woman, because she could not know at the time of her conduct whether her acts would ultimately be illegal. In so concurring, I respectfully disagree with the majority that the pivotal point is whether the term "person" as used in HRS § 707–702(1)(a) is an attendant circumstance of the crime of reckless manslaughter rather than part of the result of conduct element, that being "the death of another person," and I also respond to Justice Levinson's concurrence.

### I.

### A.

Giving the words "their most known and usual signification" and "attending . . . to their general or popular use or meaning," HRS § 1–14 (1993), the language of HRS § 707–702 prohibits reckless conduct against a human being who at the time is alive, and does not express any design to include a pregnant woman whose self-abusive conduct affects her fetus. For at the time of offending acts there is simply no person (*i.e.* one who has been born and is alive) in existence as to whom the conduct can be said to have been directed.

HRS § 707–702(1)(a) provides that "[a] person commits the offense of manslaughter if: (a) [h]e recklessly causes the death of another person[.]" In this statute, the culpable state of mind of recklessly must relate to the result of the defendant's conduct. In that regard, "person" as used in HRS § 707–702(1)(a) is defined as "a human being who has been born and is alive." HRS § 707–700 (1993). Reading the definition of person in the "usual" way according to "general or popular use," *see* HRS § 1–14, "causing" the death of a "human being who *has been* born and is alive" (emphasis added) indicates that the culpable conduct must be aimed at one *already* born. *See Cuellar v. State,* 957 S.W.2d 134, 142 (Tex.Ct.App.1997) (Rodriguez, J., dissenting) (" 'Another' is ultimately defined in the penal code as 'a human being who *has been* born and *is* alive[ ]'" and, thus, "the legislature intended that any conduct proscribed by the penal code must occur against a victim who 'has been born and is alive' at the time the conduct occurs." (Emphases in original.)); *Collins v. State,* 890 S.W.2d 893 (Tex.Ct.App.1994). Thus, "[i]f the legislature had intended criminal consequences for conduct occurring before birth of the fetus, it could have easily [indicated] so." *Cuellar,* 957 S.W.2d at 142. *See Collins,* 890 S.W.2d at 897 (stating that "the Penal Code does not proscribe any conduct with respect to a fetus"). The legislature plainly did not do so.

### B.

Thus, given a usual reading, the term "person" in the reckless manslaughter statute, HRS § 707–702, is not an attendant circumstance. With all due respect, to conclude that it is strains the language of the statute and poses potential confusion in the future regarding the parsing of statutory "elements," under HRS § 702–205 (1993). Not all elements may be necessarily contained in the definition of an offense, *State v. Aganon,* 97 Hawai'i 299, 303, 36 P.3d 1269, 1273 (2001), and an attendant circumstance has been defined more in terms of what it is not than what it is. As the majority indicates, in *State v. Moser,* 107 Hawai'i 159, 172, 111 P.3d 54, 67 (App.2005), the Intermediate Court of Appeals stated that "[a]ny circumstances defined in an offense that are neither conduct nor the results of conduct would, by default, constitute attendant circumstances elements of the offense." Majority opinion at 127, 123 P.3d at 1222.

All parts of the definition of reckless manslaughter under HRS § 707–702(1)(a) are accounted for in a state of mind, a conduct element, and a result of conduct element. This court has already said in an analogous situation with respect to the similarly worded offense of second degree murder, that

a person commits the offense of murder in the second degree when the "person intentionally or knowingly causes the death of another person." Any voluntary act ... or omission may satisfy the conduct element of the offense. The *death of another person, as the* intentional or knowing *result of the conduct, constitutes the result element of the offense.*

*Aganon,* 97 Hawai'i at 303, 36 P.3d at 1273 (emphases added). In this respect, there is no principled difference between second degree murder and reckless manslaughter, inasmuch as the identical words "the death of another person" are employed in both statutes and the same definition of the term

person in HRS § 707–700 applies in both statutes. The term person, then, should not be excised from the result of conduct element and denominated as a separate attendant circumstance as the majority proposes.

*Collins* is instructive. In that case, the defendant was charged with reckless injury to a child. Under Texas law, the proof of an offense is similar to ours, consisting of "(1) the forbidden conduct, (2) the required culpability, (3) any required result, and (4) the negation of any exception to the offense." [1] 890 S.W.2d at 898. In that case the Texas court said

*[w]hile injury to a child is a "result of conduct[,]" ... this does not mean that the actor is prosecuted for the result of the conduct, rather than the conduct itself.... [T]his means that the conduct must be done with the required culpability to effect the result the Legislature has specified, so that the culpable mental state relates to the result of the defendant's conduct, and not to the nature of the conduct. The fact remains that the actor is prosecuted for her conduct.*

*Id.* (emphases added). Likewise, under HRS § 707–702(1)(a) the accused is prosecuted for conduct which brings about the prohibited result. Hence, as the *Collins* court indicated with respect to a similar reference to injury to a child and, as this court has said in *Aganon,* the phrase "death of another person" "constitutes the result element." *Aganon,* 97 Hawai'i at 303, 36 P.3d at 1273. This is precedent binding on us and there is no compelling justification in this case for deviating from it. *See State v. Garcia,* 96 Hawai'i 200, 206, 29 P.3d 919, 926 (2001) ("While 'there is no necessity or sound legal reason to perpetuate an error under the doctrine of stare decisis' ... we agree with the proposition expressed by the United States Supreme Court that a court should 'not depart from the doctrine of stare decisis without some

---

1. Similarly, HRS § 702–205 states as follows:

    **Elements of an offense.** The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:
(1) Are specified by the definition of the offense, and

(b) Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction).
    HRS § 702–204 (1993) states in relevant part that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense."

compelling justification.'" (Quoting *Hilton v. South Carolina Pub. Ry. Comm'n,* 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.E.2d 560 (1991).)).

### C.

Thus I must also respectfully disagree with Justice Levinson's concurring opinion that such a reading of *Aganon* is "misguided." Justice Levinson's concurring opinion, at 127, 123 P.3d at 1225. This court in *Aganon* expressly said (1) that "[t]he death of another person ... constitutes the *result element of the offense* [,]" 97 Hawai'i at 303, 36 P.3d at 1273 (emphasis added), (2) that the circuit court's error in *Aganon* would permit the jury to infer "the requisite state of mind with respect to her conduct ..., but not with respect *to the death that resulted* [,]" *id.* (emphasis added), and (3) that therefore, "on remand" "the elements of 'conduct' and 'result' should be separately listed[,]" *id.,* by the circuit court. The foregoing establishes that the death of another person is the result element.

As the other concurring opinion notes, "no party [in *Aganon* ] disputed that Karie [ (the victim) ] was a 'person[.]'" Justice Levinson's concurring opinion, at 127, 123 P.3d at 1227. What was self evident in *Aganon* is also undeniable in the instant case. For, inasmuch as HRS chapter 707 relates to "offenses against the person," there can be no reasonable doubt that the entity acted upon and to which the result was proscribed in *Aganon* and in this case is a person and not, for example, "a cat," as was posited during oral argument. Hence, *Aganon* makes no reference to any attendant circumstance element at all.

Placing the reference to the victim "Karie" in context, belies the other concurrence's reading of *Aganon.* In that case, this court indicated that *"[a]ny voluntary act (e.g., physical abuse)* ... may satisfy the conduct element" as opposed to the "result of the conduct[.]" 97 Hawai'i at 303, 36 P.3d at 1273 (emphasis added). Explaining the circuit court's error, it was said, "The jury, for example, could have found [erroneously] that Aganon possessed the requisite state of mind with respect to her conduct (physical abuse of Karie), *but not with respect to the death that resulted."* *Id.* (emphasis added). Thus

this court did not place Karie into the conduct element, as the other concurrence contends, but expressly determined that Karie, a person, was a component of the result element. On the other hand, abuse was identified as an act that could constitute the conduct element. Hence Karie was not referred to "for purposes of 'personhood' analysis," Justice Levinson's concurring opinion, at 127, 123 P.3d at 1227, but only to indicate upon whom abuse was inflicted under the alleged facts.

To detach the term person from the result element on the ground of "a curious cognitive dissonance" in *Aganon, id.* at 127, 123 P.3d at 1227, is at best an untenable judicial revision of that case. It implies, without judicially admitting so, that *Aganon* was wrongly decided as to this issue and, thus, that on remand the jury in *Aganon* was erroneously instructed. With all due respect, a straightforward application of the law does not countenance such an approach.

### II.

Assuming, *arguendo,* any dispute as to opposing interpretations of HRS § 707–702(1)(a), our penal code requires that we are to strictly construe the statute. *See* Supplemental Commentary on HRS § 701–104 (1993) (Conference Committee Report on the Code rejecting a provision that "[t]he rule that a penal statute is to be strictly construed does not apply to this Code" and indicating that " '[i]t is the intent of the Committee that definitions of crimes are to be strictly construed' "). For the reasons stated *supra,* a strict construction of the statute would preclude the interpretation that HRS § 707–702(1)(a) applies when a woman's prenatal conduct causes injury to a fetus *later* born alive. *Compare* Supplemental Commentary on HRS § 701–704, *supra, with Cuellar,* 957 S.W.2d at 137 (ruling that "[p]rovisions in the Penal Code are not to be strictly construed" in determining that "a victim attains the status of an individual after the alleged misconduct").

The application of the strict construction rule comports with the decisions of other jurisdictions which, as Plaintiff–Appellee State of Hawai'i (the prosecution) candidly conceded in oral argument, have all declined

to impose criminal liability on a pregnant woman for prenatal conduct that resulted in the death of a baby born alive. *See e.g., State v. Ashley*, 701 So.2d 338, 339 (Fla.1997) (answering the certified question, "May an expectant mother be criminally charged with the death of her born alive child resulting from [a] self-inflicted [gun-shot wound to the abdomen] during the third trimester of pregnancy," in the negative); *Reinesto v. Superior Court of the State of Arizona in and for the County of Navajo*, 182 Ariz. 190, 894 P.2d 733, 734 (Ariz.Ct.App.1995) (holding that the state could not "prosecute for child abuse a woman who uses heroin during pregnancy and thereafter gives birth to a heroin-addicted child"); *State v. Deborah J.Z.*, 228 Wis.2d 468, 596 N.W.2d 490, 496 (1999) (concluding that a pregnant woman who consumed alcohol during her pregnancy could not be charged with attempted first-degree intentional homicide and first-degree reckless injury); *Collins*, 890 S.W.2d at 898 (determining that the "[a]ppellant could not be prosecuted under our current laws [for reckless injury to a child] for ingesting cocaine while pregnant even if it caused the fetus to suffer pain or impairment").[2]

### III.

The interpretation of HRS § 707–702(1)(a) as imposing liability when conduct injures a live human being satisfies due process and, thus, is to be preferred. *See State v. Gaylord*, 78 Hawai'i 127, 138, 890 P.2d 1167, 1178 (1995) (stating that, "where possible, we will read a penal statute in such a manner as to preserve its constitutionality") (internal citations omitted). Our due process clause, article I, section 5 of the Hawai'i Constitution, states in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law[.]" Inhering in the clause is the premise that "[a] penal statute is vague if a person of ordinary intelligence

cannot obtain an adequate description of the prohibited conduct or how to avoid committing illegal acts." *State v. Kam*, 69 Haw. 483, 487, 748 P.2d 372, 375 (1988).

The contrary reading such as that proposed by the prosecution would render HRS § 707–702(1)(a) vague and ambiguous as to a pregnant woman. Reading HRS § 707–702(1)(a) to the effect that prenatal conduct injuries to a fetus will result in criminal liability *if* the baby is subsequently born alive renders the statute uncertain in its application. For the question of whether criminal liability will attach would not be evident at the time of the conduct, but be entirely contingent upon the baby subsequently being born alive. Hence, were the prosecution's view of the statute imposed, a pregnant woman could not determine whether at the time of her conduct her acts were prohibited under the statute or whether such acts would eventually be deemed illegal. Thus, under the prosecution's interpretation of the statute, a pregnant woman "cannot obtain an adequate designation of the prohibited conduct" or determine "how to avoid committing illegal acts[,]" *Kam*, 69 Haw. at 487, 748 P.2d at 375, as defined in HRS § 707–702(1)(a).

The statutory mandate that the "usual" and "popular" reading be employed in interpreting a statute, *see* HRS § 1–14, is plainly intended to attribute to a statute a construction that would be readily understood by a layperson. Thus, reading the statute as applying to conduct that is directed at a person born alive not only meets statutory construction tenets, but also complies with the due process mandate that the statute be understood "by a person of ordinary intelligence." *Kam*, 69 Haw. at 487, 748 P.2d at 375.

### IV.

Therefore, I concur in the reversal of the August 25, 2004 order of the court but for

---

**2.** *Whitner v. State*, 328 S.C. 1, 492 S.E.2d 777 (1997), cited by the prosecution as a case affirming the conviction of a mother for her prenatal conduct that harmed her subsequently born child, is distinguishable from the instant case. In *Whitner*, the mother pled guilty to criminal child neglect under Section 20–7–50 of the South Carolina Code Annotated. *Id.* at 778. *See* majority opinion at 122 n. 5, 123 P.3d at 1217 n.5

for full text. In that case, the Supreme Court of South Carolina held that the word "child" in Section 20–7–50 included viable fetuses. *Id.* That court noted that "South Carolina law has long recognized that *viable fetuses are persons* holding certain legal rights and privileges." *Id.* at 779 (emphasis added). Unlike in South Carolina, neither HRS § 707–702(1)(a) on its face, nor the applicable definition of "person"

the foregoing reasons.[3]

in HRS § 707–700, indicates a viable fetus is to be treated as a person.

3. Because we are not confronted with the situation in which a third person is charged with the death of a baby born alive because he or she caused injury to the fetus, I would not reach that

situation. *See* majority opinion at 128 n.15, 123 P.3d at 1223 n.15.